SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

GALAXY FOODS, INC., et al.,
Defendants.

No. 73 C 1742.

United States District Court,
E. D. New York.

July 26, 1976.

anti-fraud provisions of both acts, § 17(a) of the Securities Act and § 10(b) of the Exchange Act, 15 U.S.C. § 77q(a) and 15 U.S.C. § 78j(b). Named as defendants are Galaxy Foods, Inc. ("Galaxy") and Arthur Lieberman, Ralph Avni, Charles Horowitz, Bruce Katz, Steven Roth, Mark Glazer, Irwin D. Kirschenblatt, George Padilla and Arthur Shevack, all of whom were either directors, officers or franchisees of Galaxy. The relief sought includes, *inter alia,* a permanent injunction against future violations of the securities laws and disgorgement of profits.[1]

Prior to the hearing on the merits, defendants Lieberman, Avni, Horowitz, Katz, Roth and Glazer consented to the entry against them of a judgment, which included a broad permanent injunction against future violations of the securities laws and a provision for disgorgement of specified dollar amounts, without admitting or denying any of the substantive allegations of the complaint. During the hearing, which lasted eight days, Padilla also consented to the entry of a similar judgment against him and the matter proceeded to conclusion solely against Kirschenblatt and Shevack.

The following constitute the court's findings of fact and conclusions of law. Rule 52(a) F.R.Civ.P.

## I. *Galaxy Foods, Inc.*

Galaxy was incorporated on September 2, 1971 by Lieberman, Avni and Rosenthal, each of whom acquired its issued and outstanding stock in approximately equal amounts in exchange for a total capital contribution of $100. Rosenthal became chairman of the board of directors and president; Avni became vice-president and Lieberman became secretary-treasurer.[2]

In October 1971, Galaxy rented a large room on Flatbush Avenue in Brooklyn which served as its principal business office. This room was subdivided into compart-

William D. Moran, for plaintiff Securities and Exchange Commission by Franklin D. Ormsten, Allan M. Lerner, Harry L. Garmansky, Regina C. Mysliwiec, Julia B. Williams, New York City, of counsel.

Goidel, Goidel & Helfenstein, for defendants Kirschenblatt & Shevack by Alvin I. Goidel, New York City.

## MEMORANDUM OF DECISION

NEAHER, District Judge.

Plaintiff Securities and Exchange Commission ("SEC") brought this action pursuant to § 20(b) of the Securities Act of 1933 ("the Securities Act"), 15 U.S.C. § 77t(b), and § 21(e) of the Securities and Exchange Act ("the Exchange Act"), 15 U.S.C. § 78u(e), alleging violations by defendants of the § 5 registration provisions of the Securities Act, 15 U.S.C. § 77e, and the

---

1. Pending resolution of this matter on the merits, all individual defendants consented to some form of preliminary restraint.

2. When Rosenthal left Galaxy in June 1972, Horowitz replaced him on the board and became secretary-treasurer, Avni became president and Lieberman became vice-president and chairman of the board.

ments and used by Galaxy's executives as individual offices. In March 1972, Galaxy rented a warehouse on Stanley Avenue in Brooklyn.

Galaxy's proclaimed business objective was to provide a free home delivery service of supermarket items. Galaxy's retail customers would order name brand supermarket items at competitive prices from a catalog prepared by Galaxy and Galaxy would fill those orders from inventory.

In order to make possible this new concept in food retailing, two important requirements had to be met: (1) salespeople had to be recruited to attract retail customers, and (2) working capital had to be raised to rent a warehouse and trucks, purchase and maintain an inventory and finance the establishment of a delivery system capable of processing thousands of individual orders. The single solution to these twin problems employed by Galaxy, i. e., the sale of franchises, is at the heart of the SEC's complaint in this action.

Franchises came in two forms: distributorships and field manager positions. A distributorship originally cost $3,000 but was raised to $5,000 in March 1972, and to $7,000 in October 1972. Field manager positions sold initially for $1,000 but increased to $2,000 in March 1972, and to $3,000 in October 1972.

As explained at meetings held by Galaxy, about which more will be said later, and in manuals produced by the company, distributors and field managers could earn money through Galaxy in two ways, referred to respectively as the retail and wholesale ends of the business.

The retail end of the business involved the actual sale of food to consumers. Distributors were offered a 15% commission on initial customer orders and a 5% commission on reorders. Field managers, in turn, were offered a 10% discount on initial orders and 3% on reorders.

Both distributors and field managers were instructed to hire salespeople to recruit retail customers by offering the salespeople a 5% commission on initial orders and 1% commission on reorders. Franchisees could thus establish sales organizations consisting essentially of salespeople doing the actual "leg work" and yielding the franchisee, the difference between the commission received from Galaxy and the lower commission paid the salesman.

The wholesale end of the business refers to the sale of franchises by existing franchisees. Distributors and field managers were encouraged to interest others, called "sponsoring," in purchasing distributorships or field manager positions. A distributor would receive a commission of $1,250, $2,000 or $2,450, depending on the prevailing selling price, for sponsoring a distributor, and $400, $750, or $1,050 for sponsoring a field manager. A field manager could earn $300, $500, or $750, depending on the prevailing franchise selling price, if he sponsored a distributor or field manager. Additionally, if a field manager sponsored a distributor, his distributor would receive the difference between the prevailing distributor commission, e. g., $1,250, and the commission received by the field manager, i. e., $300. Similarly, if a field manager sponsored another field manager, his distributor would receive the difference between the prevailing field manager commission, e. g., $400, and the commission paid the sponsoring field manager, i. e., $300.[3] Thus, approximately 35–40% of the selling price of franchises was paid as commissions to sponsoring franchisees.

The contract signed by Galaxy franchisees limited the number of distributorships Galaxy could sell to "60 per one million population per state" and specified a quota of 1,079 for New York State distributorships.[4]

3. An existing field manager could elevate to a distributor by paying the prevailing price differential between the two types of franchises and appropriate commissions would be paid out of this differential.

4. Lieberman explained the derivation of this ratio as follows:

"If there are, in fact, 20,000,000 people in New York State, we broke it down and said, what is a very comfortable living for somebody? Well, we were offering a figure of

Sales of franchises were accomplished through the medium of sales presentations given at "Opportunity Meetings" held by Galaxy. These meetings were held three to four times a week at different hotels in the New York City and Long Island area. Group size at the meetings ranged from as few as 10 to as many as 200.

Lieberman, Horowitz, Roth and Katz were the regular and, for practical purposes, the exclusive speakers at these meetings. They always spoke from the same prepared text, which had been drafted by them, Rosenthal and Avni. Speakers were not permitted to deviate from the script.

The purpose of the presentation was to explain the Galaxy concept to prospective investors, called "prospects," whom sponsors had brought to the meetings. The speakers also explained in great detail the retail and wholesale commissions to be earned. A blackboard diagram was used to demonstrate how a distributor *could* earn as much as $60,000 per year from the retail end of the business *after only three months in Galaxy.*[5] Statements by the speakers relating to how much money one could earn in Galaxy were greeted with cheers and applause by existing franchisees and Galaxy management.[6]

After the first speakers explained the retail and wholesale ends of the business, there was a guest speaker, usually Lee Horowitz or one of the other top Galaxy officials, who promised that Galaxy would itself recruit and distribute to franchisees 8–10,000 retail customers when retail operations began.

Galaxy distributors and managers were instructed to invite prospects to these meetings but to tell them little or nothing about the Galaxy operation itself. The inducement to attend the meetings was to be simply the opportunity to earn large sums of money. Distributors and managers were told to drive new, expensive automobiles, to wear expensive clothing and to carry large amounts of cash, all to convey to the prospect an illusion of success attributable to association with Galaxy.[7] Once a prospect was lured to a meeting, Galaxy's management did the rest via their established sales presentation.

In addition to Opportunity Meetings, Galaxy held "Sunday Step-Up Meetings",[8] which were designed to obtain commitments, and checks, from the prospects. This process was referred to as "closing the deal" and "getting the check" ("GTC", in Galaxy parlance).

At these meetings, which after March 1972 were held in Galaxy's rented warehouse, one speech was given by either Lee, Horowitz, Katz or Roth. Another feature of these meetings, adopted around June 1972 and referred to as "Pay-Day", was the distribution of commission checks to existing franchisees. The one distributing the checks would either call out the amount or ask a prospect to come up and call out the amount. The speaker would usually emphasize that the franchisees receiving checks had just recently joined Galaxy.

Towards the end of the meeting, prospects were called to the front of the room and asked whether they wished to join Galaxy as a distributor or as a field manager, a

---

$60,000 a year. That is a pretty comfortable living. So in order to earn $60,000 a year, a person would have to earn in excess of $1,000 a week. So we did it on a basis of 60 distributorships per million people, or 250,-000 families, which, at a 10 per cent saturation and $25 a week per family in food purchases, would amount to $1666 a week per distributor in earnings, which is in excess of $60,000 a year." Tr. 588–89.

5. The word "could" is emphasized because the script obviously was carefully drafted to avoid making an explicit representation.

6. Although Galaxy's management had at first decided against cheering at the meetings, they later acquiesced in the decision of then existing Galaxy franchisees to put more enthusiasm in the meetings.

7. A similar procedure employed by the Turner organization was referred to as "fake it 'til you make it." *Glenn W. Turner Enterprises, Inc. v. SEC,* 474 F.2d 476, 480 (9 Cir. 1973).

8. The transcript incorrectly refers to these gatherings as "Set-Up Meetings".

question implicit with an assumption. The response was greeted with cheering and applause.

The tremendous exhibitions of enthusiasm at these Opportunity and Step-Up Meetings, the cheering and applauding and the check distributions, were all part of a conscious theme on the part of Galaxy's management to create a high-pressure atmosphere in which the prospect was enveloped and imbued with an almost irrational desire to join—this process was referred to by Lieberman as "jack-up."

Bi-weekly or monthly training sessions were held for new franchisees from October 1971 until July 1973, either at Galaxy's offices or its warehouse. These training sessions were mandatory for distributors.[9] Katz was the principal instructor at these sessions.

The primary focus of the training sessions was the wholesale end of the business. Prospecting techniques such as advertising, approaching friends, relatives and associates and "cold canvassing"[10] were taught. Practice exercises were conducted and critiqued. Franchisees were taught always to think positively and to be enthusiastic. "Dare to be Great" tapes were played.[11] Franchisees were instructed not to go into any details concerning Galaxy with prospects but only to lure them to the controlled environment of the Opportunity Meetings and to rely on the sales ability of those giving the full organized presentation.

When at Opportunity or Sunday Step-Up Meetings, franchisees were directed to sit next to prospects they had brought there or, if they had come alone, to sit in the back of the room. They were told to applaud new speakers at the meetings, laugh at jokes and generally exhibit constant enthusiasm. Franchisees were encouraged to memorize the script read at Opportunity Meetings.

Franchisees were taught to suggest to prospects ways of raising the necessary funds to purchase a franchise, e. g., borrowing the cash value of insurance policies or taking loans from a bank or finance company. If the prospect was going to take out a loan, franchisees were told to drive the prospect to the lending institution and to tell them to put down furniture as the reason for the loan.

Training in the retail end of the business did not begin until the end of November 1971, and was then given in addition to training in prospecting.

Galaxy was run by two management groups, the board of directors and the executive board. The board of directors, which originally consisted of Lieberman, Avni and Rosenthal (who in June 1972 was replaced by Horowitz), actually established operational and management policy and made all important decisions, including the commission percentages to be paid. They were also Galaxy's only corporate officers. The executive board consisted of the three directors and five executive vice-presidents and was a subordinate body whose weekly meetings consisted of discussions of the events of the previous week and decision-making concerning the logistics—location, frequency and speakers—of the Opportunity Meetings and training sessions. The executive board also discussed the content, format and purpose of meetings and training sessions, e. g., the initiation of "payday", but it is unclear whether they actually voted on such matters. Only the board of directors could authorize any extraordi-

**9.** Rule 23 of Galaxy's Rules and Regulations provided: "Distributor agrees to complete the basic business management course within seventy-five (75) days of registering with the company. Should the distributor not complete said training, any commissions earned after the seventy-five (75) day period may be withheld by Galaxy until such time as the course is completed."

**10.** Cold canvassing refers to soliciting total strangers almost anywhere, e. g., on the street, at crowded train stations.

**11.** Dare to be Great was the name of a subsidiary of Glenn W. Turner Enterprises, Inc. See *Securities and Exchange Commission v. Glenn W. Turner Enterprises, Inc.,* 348 F.Supp. 766 (D.Or.1972), *aff'd,* 474 F.2d 476 *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973).

nary expenditures or promote individuals in the organization. Also, the board of directors could veto any corporate action proposed by the executive board.[12] On occasion the three directors would leave an executive board meeting to vote on an issue and then report back their decision.[13]

Each member of Galaxy's board of directors received a free distributorship and, from September 1971 until September 1973, an override commission of 3–4% based on total franchise sales.[14] Galaxy's executive vice-presidents apparently received a similar override commission but at a lower percentage rate, i. e., ½–1%. Altogether approximately 18% of gross franchise selling prices were distributed to members of the executive board as override commissions. Thus a total of approximately 53–58% of gross franchise sales was paid in various commissions, leaving only 42–47% actually to fund Galaxy.

The organizational arrangement and promotional nature of Galaxy—particularly the concept of non-exclusive franchisees, the Opportunity Meetings and the commission structure—was patterned in large part after that employed by a company called Koscot Interplanetary, Inc. ("Koscot").[15] Lieberman, as well as Galaxy founding fathers, e. g., Avni, Rosenthal and Katz, had been previously associated with Koscot.[16]

Paul J. Deceglie was introduced to Galaxy in the fall of 1971 at a presentation given by Franz Quack to 20 or 30 people at the home of his future in-laws. He subsequently attended an Opportunity Meeting and a Sunday Step-Up Meeting, during which he gave a Galaxy executive a $1,000

check to come in as a field manager and filled out an application. After joining Galaxy, he went to another Opportunity Meeting in December 1971, which was held in the New York Hilton. No mention was made at any of the meetings attended by him that Galaxy franchises were available only to New York residents. Deceglie is and was during that period a resident of New Jersey and so indicated on the application he filled out. He received mail from Galaxy at his New Jersey address.

In May 1972, Horowitz called him at his home in New Jersey and informed him that there was a problem with his being a New Jersey resident and that he would either have to establish a New York residence or withdraw from Galaxy. He chose to withdraw and received back a check representing his investment.

In the third revision of the script read at Opportunity Meetings dated October 1972, the following sentence was inserted to be read last by the speaker immediately preceding the guest speaker: "Investments are available only to residents of New York State."

During the summer of 1972, Galaxy adopted a rule, proposed by Katz, which provided that:

Six months subsequent to the commencement of full scale retail operations, distributors and field managers, regardless of their date of entry into Galaxy's program, will be permitted to exercise Galaxy Foods "final buy-back option". Distributors and field managers will be notified of their option to sell their distributorship back to Galaxy Foods, Inc. at

**12.** For example, the executive board voted to put to the distributors the question of whether to reduce to 900 from 1079 the number of New York franchises Galaxy would sell. The distributors voted to reduce but the board of directors vetoed the reduction.

**13.** As explained by Lieberman: "[C]orporate officers could sign checks. Corporate officers could demand decisions made the way they ruled. Corporate officers could fire executives. Corporate officers could virtually run the business without the executive board." Tr. 458.

**14.** Several Galaxy officials, Lieberman, Horowitz, Katz and Roth, were also granted the privilege of operating automobiles leased by Galaxy.

**15.** See *SEC v. Koscot Interplanetary, Inc.,* 497 F.2d 473 (5 Cir. 1974).

**16.** Lieberman's title at Koscot was Assistant State Director for Wholesale for Manhattan and his duties included supervising meetings at which people were introduced to Koscot and assisting franchisees in recruiting others. He received a commission based on all Manhattan franchise sales.

their original purchase price, less any commissions *earned*. Distributors will be given 30 days from the date of notification to respond to the company offer. A lack of response will be deemed by the company to be a decision to remain on active status with the company. A notification of the desire to exercise the option will be followed by an interview with the company. If the situation cannot be corrected to the satisfaction of both the company and the field manager or distributor, sixty days hence, the buy-back will be executed. The decision shall be binding and final on both parties.

Rule 25 of Galaxy's Rules and Regulations. In conjunction with the adoption of this rule, Galaxy caused to be published in several newspapers of general circulation in New York City advertisements directed at soliciting franchisees which read in part in bold print "A $2,000 or $5,000 guaranteed investment." [17] These advertisements were approved by Galaxy's executive board.

This "guarantee" apparently supplemented or superseded a previous "guarantee", which read:

Galaxy will do all in its power to commence retail operations. Should the "operating retail territory", (consisting of from 8,000 to 12,000 customers) not have begun operations by June 30, 1973, Galaxy agrees to:

A. If feasible, continue in the effort to establish the first retail foot hold.

B. Give the option to those individuals who wish to sell their distributorships back to Galaxy, at their original purchase price less commissions paid against it, less ten (10%) percent for handling and interim operating expenses. Those individuals wishing to sell, must notify the company, in writing, after the above-mentioned date. The company will complete the purchase within sixty (60) days after receiving such notification.

Rule 21 of Galaxy's Rules and Regulations.

Lieberman testified that the language of Rule 21 "less commissions paid against it" meant that an investor could get back his original investment less that amount paid as commissions, presumably 53–58%, less 10% for handling or in effect 32–37% of the original amount.

No steps were ever taken, *e. g.*, establishing a sinking fund, to ensure that funds would be available to satisfy either of these "guarantees."

As far back as the fall of 1971, Galaxy announced June 1972 as a target date for the beginning of retail operations,[18] but the target dates were continually readjusted backward as they approached. In a similar fashion, the projected designated retail territory continually shrank. In 1971, prospects and new franchisees were told at Opportunity Meetings and training sessions that the retail territory would consist of a 30-mile radius around each warehouse. In 1972, after the warehouse was actually rented, the operative radius was reduced to ten miles and later in 1972 to three miles.[19]

An article appeared in a local Brooklyn newspaper around September 1972, describing Galaxy in glowing terms and indicating that retail operations were to begin in October. The article also contained the patently false statement that Galaxy then had operations in Long Island, Poughkeepsie, Buffalo and Montreal. Although Galaxy was not responsible for the article's publication, no attempt was made to correct the erroneous statement.

The procedure contemplated by Galaxy when full retail operations began was as follows: A retail customer, living within a three-mile radius of a Galaxy warehouse, would be contacted by a salesperson (or

17. A similar advertisement approved by Galaxy appeared in the Buffalo Evening News in August 1972. These advertisements indicated that New York residents were desired, although a similar advertisement appearing in a Spanish newspaper did not limit the solicitations to New York residents.

18. A memorandum from Kirschenblatt to Galaxy franchisees dated March 10, 1972 referred to the fast approaching retail target date.

19. Shevack testified that the delivery area "changed on a daily basis."

franchisee) on a door-to-door basis or through advertising. If the retail customer was interested in buying from Galaxy, he or she would be given a catalog and asked to place a minimum $15 order. The initial order would be phoned in to the warehouse by the salesperson (or franchisee). At the warehouse, a Galaxy employee would fill out a form which would be tied into a computer system. The orders would be accumulated in the computer until the end of the day when a high-speed printer would print out copies of the order, one for the "picking" area, one for the truck, one for the distributor, and one for inventory. The computer would also deduct the ordered items from inventory. The orders would be physically filled from shelves in the warehouse and loaded on trucks for delivery. The computer was also to establish a routing sheet for the truck drivers. Finally, the computer was to credit the appropriate franchisees and salespeople with commissions and to cut checks for them. After the initial order, retail customers were to phone in their orders directly to the warehouses.

Galaxy's management estimated a need for twenty warehouses to service the New York City area, assuming only 10% of the population ordered from Galaxy. In addition, it was hoped that each franchisee would maintain an office as a place to hold meetings with his salespeople to monitor their performance.

In November 1972, Galaxy began what is called a "pilot program" to test its retail operation, although none had been mentioned at the time franchises were originally sold. At about this time, Galaxy's management altered the stated retail commission policy by requiring a "cushion" of 8,000 retail customers before paying *any* commissions on retail sales. Although it appears that Galaxy never acquired more than 4,800 customers, some commissions were paid beginning in March 1973, after vigorous protesting by the franchisees.

In conjunction with the "pilot program" and the expectation of beginning full retail operations, Galaxy purchased over $200,000 worth of food, rented ten delivery trucks,

hired as many as ninety-eight employees and spent $150,000 for computer equipment on a lease-purchase basis. During the "pilot program", which lasted from November 27, 1972 until March 31, 1973, Galaxy sold $160,000 worth of goods.

Although the "pilot program" apparently terminated in March 1973, Galaxy continued, and in fact increased its efforts, to recruit new franchisees. The guarantees of Rule 21 and 25 were deleted for franchisees joining after July 1, 1973. The sale of field manager positions ended as of August 1, 1973.

On November 28, 1973, Galaxy filed a voluntary petition in bankruptcy, listing assets of $30,000 and liabilities of $200,000. During the two-year period prior to bankruptcy, Galaxy sold in excess of 800 franchises, raising more than $2.4 million. Aside from the "pilot program", sales of franchises accounted for all of Galaxy's income from inception to demise.

### Kirschenblatt

Kirschenblatt was approached concerning employment with Galaxy by Rosenthal and Avni, who offered him a "salaried position." He joined Galaxy in August 1971, and continued until January 12, 1973, when he resigned effective February 1, 1973. He testified that his resignation was prompted by dissatisfaction with Galaxy management, their handling of the retail end of the business, their decision not to pay commissions on retail sales until eight to ten thousand customers had been acquired, and his consequent belief that the business would not succeed.

Lieberman had met Kirschenblatt at Koscot, where the latter in 1971 purchased a distributorship, which he called K Enterprises. Kirschenblatt sponsored four others into Koscot and received a commission on their sales. He also sold Koscot cosmetic products as well as jewelry, clothing and sundry items to retail customers.

While at Galaxy, he held the position of executive vice-president in charge of marketing, was one of the eight executive board members and regularly attended the

weekly meetings, including those at which Galaxy newspaper advertisements were approved. He was not a shareholder, corporate officer or director of Galaxy, but was awarded a distributorship in September or October 1971 for having sponsored two franchisees. He also earned $700 for sponsoring a third franchisee.

His work was directed primarily at making the retail end of the business functional. His duties included the creation and continued up-dating of a catalog of food items with prices to be distributed to Galaxy's retail customers, acting as food buyer for Galaxy and generally supervising all warehouse activities, e. g., inventory control. His office was located in the Galaxy warehouse.

In his capacity as executive vice-president, he earned a "salary", paid bi-weekly, which was really an override commission of ½–1% of total franchise sales. During his tenure at Galaxy, he earned a total of approximately $18–24,000.

He attended as many as 50 to 75 Opportunity Meetings and spoke at least once a month, usually giving the part of the presentation concerning retailing. He also went to twenty-five to thirty-five Sunday Step-Up Meetings, but never spoke at any. He did teach regularly a specified portion of the training sessions given franchisees. He spoke only about retailing and left after completing his presentation.

Although not specifically his function to supervise franchisees, he did assist others in selling franchises at Opportunity and Sunday Step-Up Meetings, both during and after the regular presentations. He was not involved in the preparation of the presentations given at the meetings.

One of the franchisees sponsored by Kirschenblatt, Howard R. Beck, testified that he was driving through the Queens Midtown Tunnel in August 1971, when he was handed a flyer from a passing car driven by Kirschenblatt. The flyer, which had Kirschenblatt's name and telephone number on the bottom, spoke of the possibility of earning substantial sums of money, having abundant vacation time, working "any-where in the United States, Puerto Rico, Canada or Mexico . . . .", associating "with a man who at age 35 is a multi-millionaire and who will teach you his techniques for accumulating wealth . . . ." and being part of "one of the world's fastest growing organizations . . . ."

Beck, attracted by the sums of money mentioned in the flyer, telephoned Kirschenblatt, was told a new concept in food retailing was involved and was invited to a presentation at the Summit Hotel in Manhattan. He went to the meeting, which was attended by 15–20 persons and lasted 30–45 minutes. The speakers were Lieberman, Katz and Horowitz, whose presentations concentrated on how much money could be made in Galaxy. Horowitz wrote the $60,000 figure on the blackboard and people in the back of the room applauded. After the meeting, Kirschenblatt asked him if he understood the presentation, and he told Kirschenblatt he was interested, but wanted to give it some more thought before joining. He subsequently attended another Galaxy meeting, also in August 1971, held at the Belmont Plaza Hotel and attended by 20–25 people. The format was the same as the prior meeting.

During the week following this last meeting, Kirschenblatt called him and he agreed to come into Galaxy as a field manager. He met Kirschenblatt in Queens in early September 1971 to sign the agreement and to give him a $1,000 check, then the price of a field manager position. Kirschenblatt, however, had with him an application filled out for a distributorship at a purchase price of $3,000. He told Kirschenblatt that he did not have the additional $2,000. Kirschenblatt suggested he obtain a bank loan in that amount, and offered to verify to the bank that he (Beck) was an employee of Kirschenblatt's K. Enterprises. Kirschenblatt also suggested he tell the bank the loan was for furniture. Kirschenblatt drove him to the bank and was present when he met a bank officer. The bank refused to make the loan and Kirschenblatt suggested they try a different bank, but

# 1236

Beck refused. The two of them then agreed that Beck would come into Galaxy as a field manager and if he liked the operation, he would elevate later to a distributor position. Kirschenblatt modified the application by crossing out distributor and $3,000 and inserting field manager and $1,000.

Kirschenblatt's version differs from Beck's. He testified that obtaining the loan was Beck's idea and that all he did was give Beck a "lift" to the bank. He admitted suggesting that furniture was a reason, among others, for the loan. He testified that after Beck left the bank he told him he had decided not to take out the loan.

Kirschenblatt's trial testimony concerning this loan episode is contradicted by his previous testimony before the SEC where he admitted suggesting that Beck take out a loan. His credibility is further undermined by his negative reply to whether he remembered checks being handed out at Sunday Step-Up Meetings, an occurrence he must have witnessed many times. The court credits Beck's version of the loan incident and his testimony in general.

Beck thereafter began working with Kirschenblatt, going to different areas in Brooklyn and Queens to hand out flyers and to do cold canvassing. He did in fact become a distributor in February 1972, and continued in Galaxy for another nine months to a year. During his association with Galaxy, the meetings grew in size to fifty and eventually one hundred guests.

Beck adopted the language of the flyer handed him by Kirschenblatt for his own use, even though he then knew the reference to the 35-year old multi-millionaire to be false and that the same flyer had originally been used by Kirschenblatt in connection with another business, presumably Koscot. He believed that the statements in the flyer, with the exception of the reference to the 35-year old multi-millionaire, did relate to Galaxy.

Beck was never informed prior to joining Galaxy that executives were receiving commission overrides and that some had also been granted franchises for services instead of cash. He was under the impression that the only way Galaxy executives could earn money was by wholesaling themselves.

Beck joined Galaxy because he believed the retail end of the business was a good idea. He worked the wholesale end because at that time it was the only way to earn money in Galaxy, and because he was told that it was necessary to sell franchises in order to get the retail end started.

### Shevack

Shevack's introduction to Galaxy appears to have been the result of a coincidence. During June 1972, he went to a catering hall in Brooklyn with a view to renting it. An Opportunity Meeting was underway at the time, and Lieberman, who knew Shevack from Koscot,[20] invited him to join Galaxy. Shevack disclaimed having the requisite $5,000 to purchase a distributorship and Lieberman offered to allow him to "work his way into the business" by sponsoring people through his distributorship and accumulating the resulting commission checks until $5,000 was obtained. Shevack agreed, subsequently sponsored five or six individuals, received $5,000 from Lieberman and purchased his own distributorship with the money in July 1972. Naturally, Lieberman received a commission on that purchase. Lieberman proposed this unusual transaction because of his confidence in Shevack's sales ability and his consequent desire to have him in Galaxy.

Shevack testified that one Peter Cancilla was his partner in the distributorship, that they worked together and split evenly commissions received from Galaxy.

Shevack sold the franchise for $5,500 and left Galaxy sometime between December 1972 and February 1973. He testified that he was dissatisfied with Galaxy's not paying him commissions on retail food orders

**20.** Shevack owned a Koscot distributorship with his brother and was Assistant State Director for Brooklyn at the same time Lieberman was Assistant State Director for Manhattan. He was not an officer, director or shareholder of Koscot.

he had obtained during the "pilot program." During his seven to ten months with Galaxy, he received approximately $11,000 in commissions from franchise sales in addition to the $5,500 he received upon the sale of the franchise.

While at Galaxy, he was not a director, shareholder or officer, nor did he speak at any meetings or have anything to do with the preparation of materials used at those gatherings. He did speak once on prospecting at a training session.

As a prospecting aid, he caused to be printed hundreds of 4¾" by 8" cards, which he handed out while cold canvassing. The card began with the question, "are you ready to earn $50,000 per year", continued with "a $2,000 or $5,000 if not totally satisfied guaranteed money back! investment", indicated that New York residents were sought, invited the prospect to an Opportunity Meeting, and contained Shevack's and Cancilla's names and telephone numbers.

Branch Simmons testified that he was approached by Shevack in June 1972, while in his car in Garden City waiting for a light to change. Shevack asked him if he wanted to make a lot of money, and after receiving an affirmative reply, told Simmons to lead him to the Hempstead Motor Inn. At the Hempstead Motor Inn Simmons attended his first of three or four Opportunity Meetings, after which he joined Galaxy as a field manager for $2,000. He did not have the $2,000, and so, at Shevack's urging and direction, a bank loan was obtained with furniture given as the reason for the loan.

He was influenced to join by the possibility of earning $60,000 or more per year and by Shevack's representations that Galaxy would accumulate and distribute retail customers and that his investment in Galaxy was guaranteed, i. e., that Galaxy would buy back his franchise. He was also impressed by the fact that Shevack was driving an expensive automobile, which the latter led him to believe was attributable to his association with Galaxy. Shevack also told him that retail operations were to begin during the summer of 1972 and were to include Brooklyn, Manhattan, Upstate New York and Long Island. He was not informed prior to investing that Galaxy management would receive an override commission on all franchise sales. He left Galaxy in March, 1973.

Melvin J. McLean testified that during the summer of 1972, while out on a lunch break, he was asked by Shevack, who had just driven up in a late model car, if he would like to earn $50,000 a year. McLean responded affirmatively, was given Shevack's card (described earlier) and told to come to a meeting that evening. Shevack declined to answer any of McLean's questions, saying he was in a hurry.

McLean went to the meeting that night at the New York Hilton where he heard the regular presentation, including the representation that Galaxy would distribute retail customers to franchisees. Shevack told McLean that he had already made $30,000–40,000 in Galaxy, had purchased a new Cadillac Eldorado and was in the process of buying a new home.

McLean indicated to Shevack that he did not have the funds necessary to purchase a franchise. A few days later, Shevack telephoned him and convinced him to apply for a bank loan, giving as the reason for the loan that it was for furniture and falsely stating that his wife worked for a company in Brooklyn. At this time, McLean worked as a securities clerk for a bank earning $140 per week, already had loans outstanding and was at first reluctant to go along but finally succumbed to Shevack's urgings.

The loan was refused but Shevack got McLean to go to Household Finance where he succeeded in borrowing $700. Shevack was waiting in the car for him when he picked up the $700 check, quickly took it from him and had him sign a contract. Shevack told him the money would be given to Galaxy and he would be permitted to pay the $1,300 balance for a field manager position by sponsoring others into Galaxy. He subsequently sponsored two field managers and one distributor, and thus, became a field manager himself. He was also told by Shevack that his investment was completely guaranteed, that is, he was assured of re-

covering his entire $2,000 investment, less any commissions he received for sponsoring others.

Steven Silverman and his wife testified that they were introduced to Galaxy in October 1972 by Shevack, who telephoned them at home. He drove them in his Eldorado to an Opportunity Meeting held in the Statler Hilton Hotel. He told them he had purchased the car with money earned through Galaxy. At the meeting the speakers explained the two ways of making money with Galaxy, wholesale and retail. The Silvermans were also told that retail operations were to begin in several weeks and that there was a provision that they could obtain a refund of their investment, if retail operations did not begin within a specified time. Mr. Silverman invested $7,000 and became a distributor.

The Silvermans did not have the money to invest and so Shevack convinced them to apply to a total of six banks and finance companies. Shevack told them to put down furniture as the reason for the loan and not to mention that loan applications were being filed with other lending institutions. He also gave them a phony W–2 form for Mrs. Silverman, who was not then employed, which reflected income of over $7,000 for 1971, from A & M Dental Labs. Mrs. Silverman had never heard of, much less worked for, such a company. Shevack also gave the Silvermans the name and telephone number of someone at A & M Dental in case further verification was required.

Between October 17 and 26, 1972, the Silvermans borrowed a total of approximately $6,000 from four lending institutions. As each loan check was received, Silverman endorsed it in blank and turned it over to Shevack.

During November 1972, Mr. Silverman was informed that he would be unable to earn any retail commissions until at least March 1973, because of the "pilot program." Beginning around December 1972, he began requesting a refund of his investment. His requests went unanswered. The Silvermans earned no money in Galaxy.

Shevack categorically denied ever telling anyone to take out a bank loan. He specifically denied ever driving McLean to a bank or assisting him in preparing a loan application. He similarly denied aiding Simmons in any way in connection with borrowing money. Finally, he denied preparing a W–2 for Mrs. Silverman or driving them to six lending institutions.

The court is unable to credit Shevack's testimony on these points. The similarity of Shevack's *modus operandi* as described by McLean, Simmons and the Silvermans coupled with the fact that this was the same method taught at Galaxy training sessions attended by Shevack, leads inexorably to the conclusion that he did suggest borrowing to these people, that he did drive them to the lending institutions and that he did induce them to give false answers on the loan applications. The court credits the testimony of the Silvermans, McLean and Simmons detailed above despite the fact that their credibility is not enhanced by their having allowed themselves to be enticed into these questionable acts.

## II. *Security*

■ The touchstone of the SEC's cause is the existence of a security within the meaning of § 2(1) of the Securities Act and § 3(a)(10) of the Exchange Act.[21] 15 U.S.C. §§ 77b(1) and 78c(a)(10). Both sections, which are to be read in *pari materia, see Tcherepnin v. Knight,* 389 U.S. 332, 335–36,

21. Section 2(1) reads:

"(1) The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."

88 S.Ct. 548, 19 L.Ed.2d 564 (1967); *Glen Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1034 n. 6 (2d Cir. 1974), include, in the definition of security, an investment contract. The SEC argues that the franchises sold by Galaxy are investment contracts. Defendants disagree. Their respective contentions must be judged against the backdrop that the securities laws are to be flexibly construed to effectuate their remedial purpose, *Tcherepnin v. Knight, supra*, 389 U.S. at 337, 88 S.Ct. 548; *S. E. C. v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963), and that the definition of security:

> "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *SEC v. Howey*, 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946).

The obvious starting point of analysis is the *Howey* case, *supra*, where the Court found an investment contract to exist where:

> "a person invests his money in a common enterprise and is led to expect profits *solely* from the efforts of the promoter or a third party." 328 U.S. at 299, 66 S.Ct. at 1103 (emphasis supplied).

While a literal reading of the quoted language seems to exclude situations involving an element of investor participation in the profit-making activity, like that here, several Courts of Appeals have held the Court's language to state a rule of inclusion, rather than exclusion. *S. E. C. v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir. 1974); *S. E. C. v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir.) *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973).[22] *See also, 1050 Tenants Corp. v. Jakobson*, 503 F.2d 1375, 1378 n. 5 (2d Cir. 1974); *Lino v. City Investing Co., Inc.*, 487 F.2d 689 (3d Cir. 1973); *McCown v. Heidler*, 527 F.2d 204, 211 (10th Cir. 1975).

Thus, the use of the word "solely" in *Howey, supra*, does not foreclose finding an investment contract in situations where there is some investor participation. Instead, the existence of a security turns on an analysis of the nature and extent of the investors' participation in, and control over, the fate of their investments. While the exact degree of investor participation and control necessary to remove a promotional enterprise from the coverage of the securities laws cannot, because of the virtually limitless permutations of such schemes, be stated in advance, "the efforts by those other than the investor [should be] the undeniably significant ones . . . which affect the failure or success of the enterprise." *Koscot, supra*, 497 F.2d at 483, quoting from *Turner, supra*, 474 F.2d at 472. This test is consistent with the purpose of the securities laws "to protect passive, relatively uninformed investors . . . ." *Mr. Steak, Inc. v. River City Steak, Inc.*, 324 F.Supp. 640, 644 (D.Colo. 1970), *aff'd in pertinent part*, 460 F.2d 666 (10 Cir. 1972).

Here, there are two distinct aspects to the Galaxy concept, the wholesale and retail ends of the business, and the degree of investor participation and control differed with respect to each. Accordingly, they should be analyzed separately. A finding of insufficient investor participation and control concerning either aspect would justify concluding that a security exists. *SEC v. United Benefit Life Insurance Company*, 387 U.S. 202, 207, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967).

As concerns the wholesale end of the business, there is no doubt that investor participation was minimal. Galaxy made no attempt to attract only persons with established sales ability. Thus, new franchisees were taught and strictly instructed

---

**22.** In *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 2060 n. 15, 44 L.Ed.2d 621 (1975), the Court noted the *Turner* construction of the word "solely" in the *Howey* opinion but expressed no view as to its correctness. In *Parvin v. Davis Oil Company*, 524 F.2d 112, 116 n. 2 (9 Cir. 1975), the Ninth Circuit noted the *United Housing Foundation, supra*, opinion and went on to apply the *Turner* construction of *Howey*.

to do no more than whet a prospect's appetite sufficiently to lure him or her to an Opportunity Meeting. Once there, Galaxy's management, employing a pre-established program in a controlled environment, would accomplish the "hard sell" for which the sponsor would receive the commission.[23] See, Koscot, supra, 497 F.2d at 485.

Nor was the wholesale end of the business an insignificant function to either Galaxy or its franchisees, even though there was evidence that the potential number of franchises which Galaxy would sell in New York was limited to 1,079. In the first place, unless sufficient franchises were sold, the retail end of the business would never get started. Existing franchisees were constantly reminded of this fact by Galaxy's management. Moreover, franchisees knew that until the retail end became operational, the wholesale end was the only way to earn money in Galaxy.

Thus, the court concludes, as did the Turner and Koscot courts, that the investors' efforts relating to the wholesale end of the business were not "undeniably significant ones"[24] and that accordingly, the sales of Galaxy franchises were the sales of investment contracts within the meaning of the securities laws.

While for practical purposes the analysis could end here, even the retail end of the business involves insufficient investor participation and control to elude the securities laws. While it was possible for franchisees personally to accumulate and service retail customers, the true economic inducement, see SEC v. Joiner Leasing Corp., 320 U.S. 344, 352–53, 64 S.Ct. 120, 88 L.Ed. 88 (1943), was to hire salespeople to accomplish that end and to pocket the commission differential. These salespeople, although technically employees of the franchisee, were in reality employees of Galaxy, which was to register them, train them[25] and pay them.

This finding is supported by the opening statement of the first speaker at the Opportunity Meetings:

"[I]t is my responsibility . . . to explain how you can earn fantastic sums of money, merely by recruiting salesmen and having them introduce our service to the consumer. Your position would be one of management, for the smart businessman must realize that only as an employer can he ever reach financial success."

As the Court in SEC v. Joiner Leasing Corp., supra, noted:

"In the enforcement of an act such as this it is not inappropriate that promoters' offerings be judged as being what they are represented to be." Id.

Moreover, the success of any one Galaxy franchisee was inextricably linked to the success of the whole Galaxy operation. Without Galaxy's order-taking, warehousing, packaging, weighing, cutting and deliv-

23. Lieberman testified that
 "They [new franchisees] were told in training sessions to be enthusiastic, to applaud the speakers who came up because, after all, we felt that speakers were taking a great burden of doing a lot of work for them by not making them go through the presentation before each one of these individuals. In effect, they were working for them." Tr. 371; emphasis supplied.

24. The defendants apparently concede as much.
 "62. The conduct of a franchisee in relation to the solicitation of additional franchisees was nothing more than the performance of a ministerial act." Defendants' Proposed Findings of Fact, ¶ 62.

25. Compare Lino v. City Investing, supra, where the court upheld a lower court's determination that the franchise agreement in question was not a security. In Lino, the defendant would contract with a franchisor seeking to market its products. The defendant would also enter into agreements with licensees (franchisees) who were to recruit area distributors to represent the franchisor; the area distributor was, in turn, required to recruit sub-franchisees who would actually market the franchisor's products. Plaintiff licensee (franchisee) under the contract with the franchisor was obligated to devote his "full time and best efforts" to the enterprise and was obligated not only to recruit but actually to train area distributors working under him. Since the licensee (franchisee) was to receive certain percentages of the fees paid to the defendant by area distributors and their sub-franchisees, all of the licensee's (franchisee's) profits were, in large measure, to be derived either directly or indirectly from the training and promotional program established by the licensee himself.

ery services, an individual franchisee could simply not function. Thus, the Galaxy franchisee had no practical control over the success or failure of his own franchise.[26] See *Mr. Steak, supra,* 324 F.Supp. at 645, and cases cited therein.

This is to be contrasted with a traditional franchisee who can obtain needed raw materials elsewhere and who purchases for the most part only a name and a business style from the franchisor and is thus a relatively independent economic entity. *See, e. g., Bitter v. Hoby's International, Inc.,* 498 F.2d 183, 185 (9th Cir. 1974); *Mr. Steak, supra,* 324 F.Supp. at 647. The focal point of a traditional franchise is the franchisee's retail outlet; here the center of activity was the Galaxy warehouse. Once a retail customer was obtained, the customer was to phone the food order directly into Galaxy, which would process and deliver it. No effort on the part of the franchisee was required.[27]

Additionally, a traditional franchisee must usually manage the day-to-day operations of the franchise. *Bitter, supra; Nash & Associates, Inc. v. Lum's of Ohio, Inc.,* 484 F.2d 392, 394–95 (6th Cir. 1973); *Mr. Steak, supra,* 324 F.Supp. at 642; *L. H. M. Inc. v. Lewis,* 371 F.Supp. 395 (D.N.J.1974), *aff'd.,* 510 F.2d 970 (3d Cir. 1975). Here, the Galaxy franchise was almost entirely passive except for the initial recruiting of salespeople and/or retail customers. *Cf. Huberman v. Denny's Restaurant, Inc.,* 337 F.Supp. 1249 (N.D.Cal.1972). The recruiting to be done by franchisees was in fact ministerial, not managerial in any true sense, *see Mitzner, supra,* 358 F.Supp. at

1267–68.[28] Even this aspect was undercut by Galaxy's promise to accumulate on its own, some 10,000 retail customers which it would then distribute to franchisees.[29]

■ In sum, prospective franchisees were being asked to invest substantial sums of money in Galaxy for which the essence of the consideration received was not products or otherwise useful training, *see Wieboldt v. Metz,* 355 F.Supp. 255, 257 (S.D.N.Y. 1973), but simply the opportunity to earn money if the efforts of others, Galaxy's management and the salespeople, proved successful. Offerings of this nature are exactly what Congress intended to subject to the registration and anti-fraud provisions of the federal securities laws.

■ The court's conclusion that Galaxy franchises were securities is further reinforced by the fact that the one-time franchisee fee paid by investors in Galaxy [30] was the sole contemplated source of its initial working capital. *See Hawaii v. Hawaii Market Center, Inc.,* 52 Hawaii 642, 485 P.2d 105 (1971). By no stretch of the imagination can it be said that the $100 initially invested by Galaxy's incorporators was sufficient to finance the huge inventory and complex delivery system which was needed to render functional the retail end of the business.

Nor can it be said that prospects were being asked to invest in a proven business concept. *Cf. Mr. Steak, Inc. v. River City Steak, Inc., supra,* 324 F.Supp. at 647. Indeed, Galaxy's own promotional material, which was read at every Opportunity Meeting, proclaimed that the Galaxy concept

**26.** This factor also serves to satisfy the common enterprise criterion of the *Howey* test. 328 U.S. at 299, 66 S.Ct. 1100.

**27.** See *Mitzner v. Cardet International, Inc.,* 358 F.Supp. 1262 (N.D.Ill.1973), where the court refused to dismiss a complaint predicated on a franchise arrangement being a security even though the franchisee actually took the retail order, transmitted it to the franchisor, received the goods from the franchisor and delivered them to the retail customer.

**28.** It was contemplated that franchisees must hold periodic meetings with their salespeople to

supervise their productions, but this could hardly consume more than a few hours a month.

**29.** A Galaxy flyer, extolling the benefits of Galaxy's contemplated retail operation, stated: "Satisfaction is guaranteed by Galaxy Foods, not the independent distributor . . . ."

**30.** As contrasted with a traditional franchise where the franchisor's "financial participation was unlimited, and [he] remained liable for continuing operational expenses." *Mr. Steak, Inc. v. River City Steak, Inc., supra,* 324 F.Supp. at 645.

"could revolutionize the food industry" and described its business objective as "a most unusual joint venture," "still a dream," "a new way of reaching and servicing the consumer" and "this revolutionary new service."

The speculative nature of the proposed business and the fact that investors were being called upon to provide essentially all of the "turn-key" financing for the entire enterprise marks unmistakably a promotional scheme of the type Congress intended to embrace within the Securities Acts.[31] See, e. g., S.E.C. v. Joiner Leasing Corporation, supra; S.E.C. v. Glenn W. Turner Enterprises, Inc., 348 F.Supp. 766, 773 (D.Ore. 1972), aff'd on other grounds, 474 F.2d 476 (9 Cir. 1973).

### III. § 5 Violations

Section 5 of the Securities Act, 15 U.S.C. § 77e,[32] prohibits the sale of a security by any person unless a registration statement is in effect as to that security. The court has found the sale of Galaxy franchises to be the sale of securities and there is no doubt that no registration statement was ever in effect with respect to those franchises. Violations of § 5(a) and (c) thus follow automatically, unless some exemption from registration is available.[33]

■ The burden of establishing the availability of an exemption is on the one claiming it. S.E.C. v. Ralston Purina Co., 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953); S.E.C. v. Culpepper, 270 F.2d 241, 246 (2 Cir. 1959).

Section 4(1) of the Securities Act, 15 U.S.C. § 77d, exempts from the registration requirements of § 5 "[t]ransactions by any person other than an issuer, underwriter, or dealer. . . . " Here, Galaxy itself is undoubtedly an issuer. The primary question is whether Kirschenblatt and Shevack are underwriters.

Section 2(11) defines an underwriter as "any person who . . . sells for an issuer in connection with . . . the distribution of any security, or participates or has a direct or indirect participation in any such undertaking . . . ." 15 U.S.C. § 77b(11).

Defendants argue that they have not violated § 5 because they did not sell any franchises. This argument is premised on the contention that only Galaxy management could actually offer and sell a franchise; sponsors could only invite prospects to the various meetings.

■ This argument is unpersuasive. Section 2(3) defines "sale" as including "every . . . attempt or offer to dispose of, or solicitation of an offer to buy, a security . . . ." 15 U.S.C. § 77b(3) (emphasis supplied). The clear intent of Congress was to embrace a wide range of conduct from initial solicitation or inducement to the actual offer and sale. See

---

**31.** It is thus unnecessary to decide whether the Galaxy franchises were profit sharing agreements or securities in the traditional sense as urged by the SEC.

**32.** Section 5(a) and (c) provide:

"(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation any such security for the purpose of sale or for delivery after sale. * * * (c) It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77 of this title." 15 U.S.C. § 77e.

**33.** There was ample evidence that Galaxy made extensive use of the jurisdictional means, i. e., mails, telephones and newspapers, in conducting its prospecting activities. The individual defendants also used the telephones in soliciting others. See Lennerth v. Mendenhall, 234 F.Supp. 59, 63 (N.D.Ohio 1964).

*S.E.C. v. Chinese Consol. Benev. Assn., Inc.*, 120 F.2d 738 (2 Cir.), *cert. denied*, 314 U.S. 618, 62 S.Ct. 106, 86 L.Ed. 497 (1941). The sponsoring activities of Kirschenblatt and Shevack clearly fall within that embrace.[34] *S.E.C. v. Culpepper, supra*, 270 F.2d at 247. Certainly, the prospects they lured to Opportunity Meetings were not in such a position vis-a-vis Galaxy that they either had or had access to information which a registration statement would have had to disclose. *S.E.C. v. Ralston Purina, supra*, 346 U.S. at 125–127, 73 S.Ct. 981.

■ There was testimony to the effect that Galaxy obtained the opinion of counsel that its franchises were not securities and presumably relied thereon. Even if true, Galaxy's good faith sale of unregistered securities would not be a defense to § 5 liability. See *SEC v. Guild Films Co., Inc.*, 279 F.2d 485, 490 (2 Cir.), *cert. denied sub nom. Santa Monica Bank v. SEC*, 364 U.S. 819, 81 S.Ct. 52, 5 L.Ed.2d 49 (1960)—"It would be of little solace to purchasers of worthless stock to learn that the sellers had acted 'in good faith.' "

Defendants also seem to stress the intrastate exemption of § 3(a)(11), 15 U.S.C. § 77c(a)(11). Although beginning sometime in 1972, Galaxy did attempt to limit offers to New York residents, prior thereto offers were indiscriminately made and at least one franchise was sold to a New Jersey resident, Deceglie.[35]

"A basic condition of the [intrastate] exemption is that the *entire issue* of securities be offered and sold exclusively to residents of the state in question. Conse-quently, an offer to a non-resident which is considered a part of the intrastate issue will render the exemption unavailable to the entire offering." Securities Act Release No. 4434 (December 6, 1961) (emphasis in original).

■ Here, the entire Galaxy wholesale operation was part of a single plan of financing which continuously offered the same type of investment and thus constituted but one offering. *Cf. Shaw v. United States*, 131 F.2d 476, 480 (9 Cir. 1942). The intrastate exemption is therefore unavailable to *any* Galaxy franchise sales, even those sold to New York residents. See *SEC v. Van Horn*, 371 F.2d 181, 188–89 (7 Cir. 1966); *Capital Funds, Inc. v. SEC*, 348 F.2d 582, 586 (8 Cir. 1965); *SEC v. Hillsborough Investment Corp.*, 173 F.Supp. 86, 88 (D.N. H.1958), *aff'd*, 276 F.2d 665 (1 Cir. 1960); *SEC v. Los Angeles Trust Deed and Mortgage Exchange*, 186 F.Supp. 830 (S.D.Cal.), *aff'd*, 285 F.2d 162 (9 Cir. 1960). This is consistent with the fact that whereas § 4 exempts transactions, § 3 exempts securities.

Accordingly, the court concludes that Kirschenblatt and Shevack are guilty of § 5 violations resulting from their sponsoring activities.

Kirschenblatt, moreover, is also liable for § 5 violations because of his efforts in assisting others in selling franchises at Opportunity and Step-Up Meetings. Finally, Kirschenblatt, in his role as a Galaxy executive (discussed more fully below) is guilty of aiding and abetting Galaxy's § 5 violations. See *SEC v. Management Dynamics, Inc.*,

---

**34.** See *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 810 (2 Cir. 1975), request for stock quotation and breadth of market held solicitation of an offer to buy sufficient to sustain § 5(c) violation. See also *SEC v. Chinese Consol. Benev. Assn., Inc., supra*, 120 F.2d at 741, where, in apposite language the court said, referring to the § 4 exemption:

"It does not in terms or by fair implication protect those who are engaged in steps necessary to the distribution of security issues. To give Section 4(1) the construction urged by the defendant would afford a ready method of thwarting the policy of the law and evading its provisions."

**35.** Another franchisee, Werner Kunst, listed his address on his Galaxy field manager application dated 2/20/72 as Hamburg-Schenefeld, Germany. Galaxy was obviously aware of Kunst's German residence because by document dated 12/31/71, he was appointed First Assistant Vice-President of European Operations and allotted $800 to conduct research on the feasibility of Galaxy operating in Europe. Kunst paid $2,000 more and became a distributor on May 22, 1972.

Lieberman's testimony that no application for a franchise by a non-New York resident was ever accepted is simply untrue.

515 F.2d 801, 810–11 (2 Cir. 1975); *SEC v. North American R & D Corp.*, 424 F.2d 63, 81–82 (2 Cir. 1970).

## IV. *Anti-Fraud Violations*

Section 17(a)[36] of the Securities Act, § 10(b) of the Exchange Act[37] and Rule 10b–5[38] promulgated thereunder, as judicially construed and applied, mandate fair dealing in the purchase and sale of securities.[39] See *SEC v. Capital Gains Research, supra*, 375 U.S. at 201, 84 S.Ct. 275.

■ The SEC attributes a host of false statements, actions and omissions to Galaxy in general and to Kirschenblatt and Shevack in particular. Before discussing the more blatant particular misstatements and omissions, it seems clear that the totality of the carnival-type Opportunity and Step-Up Meetings, the "Jack-Up" objective and the "fake it 'til you make it" approach to selling constitutes a manipulative and deceptive device proscribed by § 17(a)(1) and (3) of the Securities Act, § 10(b) of the Exchange Act and Rule 10b–5(1) and (3). The psychological selling techniques employed by Galaxy successfully duped many innocent, though unwise, investors into parting with funds, often borrowed, which they could ill-afford to invest even in far safer enterprises.

Most apposite to the Galaxy promotional scheme is the following language from the report of the House Committee on Inter-

**36.** Section 17(a) states: "(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—(1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a).

**37.** "§ 78j. *Manipulative and deceptive devices.* It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—. . . (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j.

**38.** Rule 10b–5 C.F.R. Section 240.10–5 (1970): "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,—in connection with the purchase or sale of any security."

**39.** Use of jurisdictional means need be only slight. Here, as indicated earlier, Galaxy clearly made extensive use of mails, telephones, etc. The individual defendants also made sufficient use of the telephones in selling franchises to establish this court's jurisdiction as to their primary violations, even though there may have been no fraudulent statements made over the phone. See *Hilton v. Mumaw*, 522 F.2d 588, 602 (9 Cir. 1975); *Kerbs v. Fall River Industries, Inc.*, 502 F.2d 731, 737–38 (10 Cir. 1974); *Lawrence v. SEC*, 398 F.2d 276, 279 n. 2 (1 Cir. 1968); *Myzel v. Fields*, 386 F.2d 718, 727 (8 Cir. 1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); *Heyman v. Heyman*, 356 F.Supp. 958, 969 (S.D.N.Y.1973); *Dupuy v. Dupuy*, 511 F.2d 641, 642–43 (5 Cir. 1975); *Aquionics Acceptance Corp. v. Kollar*, 503 F.2d 1225 (6 Cir. 1974); *Roe v. United States*, 316 F.2d 617, 621 (5 Cir. 1963), where the court said:

"[C]ircumstances might be such that a jury could conclude that in a high pressure sales campaign, the promoters thought it wise to allay apprehension of those who had purchased by a continuation of reassuring literature. Likewise, such material would be admissible in showing any one or more or all of the uses of the mails in the course of bringing about the sale as ultimately consummated." *Id.*

This language is apposite here. *Cf. United States v. Ashdown*, 509 F.2d 793, 799–800 (5 Cir. 1975).

state and Foreign Commerce relating to the proposed Securities Act:

> ". . . $25,000,000,000 worth of securities floated . . . proved to be worthless. These cold figures spell tragedy in the lives of thousands of individuals who invested their life savings, accumulated after years of effort, in these worthless securities . . .. Alluring promises of easy wealth were freely made with little or no attempt to bring to the investors' attention those facts essential to estimating the worth of any security. High-pressure salesmanship rather than careful counsel was the rule in this most dangerous of enterprises."

H.R.Rep.No.85, 73rd Cong., 1st Sess. p. 2 (1933).

[redacted] There is evidence in the record that Galaxy's promoters sincerely hoped that the retail enterprise would be successful and that consequently their franchisees would prosper. Nor can it be said efforts were not made to implement the retail end of the business. These factors, however, do not mitigate the fraud perpetrated on the public investors. However strongly the promoters of an enterprise may believe in its potential, prospective investors must still be dealt with fairly and the unadulterated decision to invest or not must be theirs alone. The cornerstone of any contractual arrangement is the agreement of the parties, concluded without overreaching. While the profit of the defrauded may in private litigation absolve the defrauder from damage, in actions brought to protect the public interest, it is of no moment.

Moreover, any notion of good faith by Galaxy promoters is belied by the huge overrides,[40] totalling 18%, they took notwithstanding that Galaxy had never earned a cent from retail operations.

It would take pages to list all the untruths, half-truths and unrealistic projections and predictions contained in the presentations and literature associated with Galaxy. Among the more frequent and flagrant violations of § 17(a)(2) and 10b–5(2) which the court finds established by the evidence are the following:

*Misrepresentations*

1. An investment in Galaxy was guaranteed.
2. Galaxy would accumulate and distribute 8,000–10,000 retail customers to its franchisees.
3. Galaxy was already operating in New York City, Buffalo, Poughkeepsie, Montreal, Canada and New Jersey.
4. Galaxy would begin retail operations in June 1972.

*Omissions*

1. Galaxy's management was receiving overrides equalling 18% of gross franchise sales.
2. Certain Galaxy executives had received franchises for "services."
3. None of Galaxy's incorporators or key executives had any managerial experience in the retail food industry.
4. No retail commissions were to be paid during the "pilot program."

[redacted] Each of the misrepresentations and omissions listed above was material in that a reasonable investor *would* have unquestionably considered them important in making the decision to invest in Galaxy or not. *Affiliated Ute v. United States,* 406 U.S. 128, 154, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *SEC v. Shapiro,* 494 F.2d 1301, 1305–06 (2 Cir. 1974); *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2 Cir. 1968) (*en banc*). *Cf. TSC Industries, Inc. v. Northway, Inc.,* —— U.S. ——, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

[redacted] While negligence alone suffices as a standard for liability in enforcement proceedings, *SEC v. Spectrum, Ltd.,* 489 F.2d 535, 541 (2 Cir. 1973); *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1096 (2 Cir. 1972); *Hanly v. SEC,* 415 F.2d 589, 596 (2 Cir. 1969), the misrepresentation and omis-

40. For example, it appears that Lieberman was paid about $90,000 during his tenure with Galaxy.

**1246**

sions found here were made or withheld either with actual knowledge or with reckless disregard for the truth.

The evidence reveals that the guarantees were adopted and touted by Galaxy with reckless disregard for its ability to honor them. No sinking fund was established, no insurance taken out and, more importantly, Galaxy officials knew that 53–58% of funds received from franchise sales were being immediately paid out in various commissions, leaving less than 50% for working capital.

Similarly, the projections concerning the commencement of retail operations and the promise to distribute thousands of retail customers were made without regard to Galaxy's ability to realize them. See *SEC v. Management Dynamics, supra,* 515 F.2d at 809;[41] *SEC v. North American R & D, supra,* 424 F.2d at 75. The representation relating to the geographical scope of Galaxy's operation was *known* to be false when made.

While there was no proof in the case that the omissions listed above were deliberately withheld from prospective investors, in view of their obvious importance, the court concludes that the failure to make them known to prospective investors was in reckless disregard of the duty to disclose.

It now remains to discuss the involvement of these particular defendants in the total Galaxy operation and their individual activities in sponsoring others.

*Kirschenblatt*

Although Kirschenblatt was chiefly responsible for the retail end of the business, his position and activities on the executive board made him a participant in the planning and execution of the Opportunity and Sunday Step-Up Meetings and the organization of the training sessions. Moreover, he continually assisted others in selling franchises at Opportunity and Sunday Step-Up Meetings by explaining to pros-

pects details of the Galaxy program both during and after the presentations. He also taught at the training sessions. There is no question that he had a vested financial interest in the success of the promotional scheme since his "salary" was intimately linked to franchise sales. His involvement in the entire Galaxy operation is clearly sufficient to constitute him an aider and abettor of Galaxy's wrongdoing. *SEC v. North American R & D Corp., supra,* 424 F.2d at 83; *Gross v. SEC,* 418 F.2d 103 (2 Cir. 1969). In sum, he associated himself with the venture and by his efforts sought to further it. See *SEC v. Coffey,* 493 F.2d 1304, 1316 (6 Cir. 1974), *cert. denied,* 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975).

Nor can it be said that his participation in the overall fraudulent scheme was merely the result of his failure to exercise due care. Clearly, in view of his prior association with Koscot and his presence at many Opportunity and Step-Up Meetings, he was surely aware of the many misrepresentations and omissions and the unsavory nature of the fraudulent high-pressure selling being employed.

His sponsoring of three franchisees is also sufficient to charge him with aiding and abetting. By sponsoring others, he both caused them to be exposed to Galaxy's fraudulent conduct and thereby furthered the overall Galaxy promotional scheme.

Finally, he is primarily responsible for anti-fraud violations in connection with his sponsoring of Beck. The flyer used by him in soliciting Beck contained patently false statements, *i. e.,* the possibility of working anywhere in the United States, Canada or Mexico and being taught how to earn large sums of money by a 35-year old multimillionaire, and many half-truths, *e. g.,* the possibility of earning $2,000–$4,000 a month in a relatively short time, as part of one of the world's fastest-growing organizations.

In view of his familiarity with the Galaxy operation and its personnel and his utiliza-

---

41. The language of the court in *Management Dynamics, supra,* is most apt:

"[T]he impression [was given] that the project was virtually certain to be completed, when the hurdles to development were so formidable that it was in fact little more than an idea in which the developers had faith." *Id.*

tion of the flyer from another promotional business, presumably Koscot, the court must conclude that these representations were made either with actual knowledge of their falsity or with reckless disregard for their truth or falsity. Certainly, as the person chiefly responsible for the progress of the retail operation, he must have realized that there was no possibility of Beck's earning any money, let alone $50,000 a year, from the proposed retail operation for some time.

The misrepresentations in his flyer and his omitting to inform Beck of the commission overrides, a fact of which he was certainly aware, were material in that a reasonable investor would certainly have considered knowing the truth important in deciding on a course of action or inaction.

*Shevack*

■ We start with the fact that Shevack was not an officer, director or shareholder of Galaxy and did not speak at Opportunity or Sunday Step-Up Meetings. Nevertheless, his sponsoring of other franchisees thereby deliberately exposing them to the Galaxy "sell-machine", and his having given one training session about prospecting are sufficient to constitute him an aider and abettor of the entire Galaxy operation. In view of his prior position in Koscot, the court must conclude that he was fully aware of Galaxy's fraudulent conduct. Indeed, Lieberman asked him to join Galaxy and offered him a special buy-in arrangement because of his past experience in this type of operation.

Moreover, the evidence clearly reveals that his prospecting and sponsoring activities, which can best be characterized as unscrupulous, are more than sufficient to

establish primary liability for anti-fraud violations. Among the more blatant material false statements which the court finds attributable to him are: (1) his representations to McLean and the Silvermans that he had already earned $30,000–$40,000 in Galaxy and had purchased a new Cadillac Eldorado from those earnings; and (2) his representation to the Silvermans that their investment was completely guaranteed. Although as discussed above, negligence alone is a sufficient standard for liability in enforcement cases, Shevack's misrepresentations were uttered either knowingly or with reckless disregard for their truth or falsity. The conclusion is inescapable, in view of his familiarity with this type of operation, that he must have realized there was little chance of the "guarantees" amounting to anything.

Similarly, he knowingly omitted to inform his prospects that none of Galaxy's executives had any experience in food retailing and that large overrides would be taken out of their investments, facts of which he was certainly aware because of his close relationship with Galaxy and its top officials.

■ Both defendants argue that even if Galaxy and they did misrepresent the facts to prospects, those misrepresentations were not relied on because the prospects were aware of the true facts before they joined. This argument is supported to some extent by a disclaimer, reproduced in the margin,[42] which appeared on Galaxy's application form in bold print immediately above the place for the applicant's signature. For the reasons which follow, however, defendants' contention is without merit.

First, the disclaimer addresses itself principally to the fact that Galaxy was not

---

42. "(B) *APPLICANT ACKNOWLEDGES THAT:*

(1) *GALAXY, PRESENTLY, IS NOT RETAILING, FOODS OR OTHER SUPERMARKET ITEMS.*
(2) *GALAXY IS A STARTING COMPANY AND IT MAY NEVER DEVELOP TO THE POINT WHEREBY DISTRIBUTORS MAY EARN PROFITS, SALARIES OR COMMISSIONS FROM THE SALE OF SUCH ITEMS.*

(3) *APPLICANT UNDERSTANDS THAT HIS/HER INVESTMENT WITH GALAXY IS A HIGH RISK INVESTMENT. HOWEVER, APPLICANT HAS DETERMINED SUCH INVESTMENT, ALTHOUGH WITH RISK, IS A SOUND VENTURE INVESTMENT WITH A NEW AND EMERGING COMPANY, POSSESSING A HIGH POTENTIAL FOR SUCCESS."*

retailing. It does not even begin either to specify any of the material omissions listed above, or to correct misrepresentations concerning the geographical scope of Galaxy's operations, the guarantees, and that no commissions were to be paid during the "pilot program." It certainly did not correct the individual misstatements, discussed above, of Kirschenblatt and Shevack.

Moreover, by the time a prospect was prepared to join, it is unlikely that most, if any, even read the application which was treated by the sponsors as a mere closing formality.

Finally, there is authority for the proposition that reliance is irrelevant in the context of an SEC enforcement proceeding. Cf. SEC v. North American R & D Corp., 424 F.2d at 84; SEC v. Lum's, 365 F.Supp. 1046, 1059 (S.D.N.Y.1973).[43] Cf. United States v. Ashdown, 509 F.2d 793, 799 (5 Cir. 1975).

## V. Injunctive Relief

■ The SEC argues that given the defendants' past association with Koscot and Galaxy, and their present connection with a similar business venture, Futuristic Foods, Inc. ("Futuristic"), together with the finding of violations of both the registration and anti-fraud provisions of the securities laws, establishes a clear propensity to violate those statutes and requires a permanent injunction against future violations in the public interest. The court agrees.

### Futuristic Foods

The evidence shows that Futuristic was incorporated in January 1973 by Peter Cancilla, Bill Reichert and Shevack. Its purpose is to provide a free home delivery service of supermarket items. Shevack admits he adopted the idea from Galaxy.

Kirschenblatt joined Futuristic in February 1973, after having been asked to do so by Shevack. He is vice-president in charge of administration, earning an annual salary of approximately $20,000. His duties include organizing and implementing the acquiring of retail customers and the purchasing and delivering of food.

Futuristic sells franchises to raise working capital. There are two types of franchises, one for $2,000 (now $3,000) and the other for $5,000 (now $6,000), which entitle the franchisee to different commission percentages on retail food sales and for sponsoring other franchisees. These franchises were sold at weekday and weekend meetings. The main speakers were Shevack and Cancilla; Kirschenblatt spoke about retailing. The meetings were first held at the company's business offices and later, as the assemblage grew, at hotels. According to Kirschenblatt, these meetings were more businesslike than Galaxy's.[44]

Franchisees were required to attend monthly training sessions, at which Kirschenblatt spoke about retailing.

Apparently Futuristic has actually been operating a retail food business since December 1973, and presently grosses about $20,000 a week. It employs about 60 persons, 30 of whom sell franchises on a fixed salary. It also owns five trucks and rents five others. Price lists are sent to approximately 8,000 customers every two weeks. Retail commissions are, and have been, paid regularly.[45]

With respect to the anti-fraud provisions, there can be no doubt as to the need for a permanent injunction. The court has concluded that both defendants were guilty of anti-fraud violations. "[F]raudulent past conduct gives rise to an inference of a reasonable expectation of continued violations

43. Additionally, as concerns the material omissions, reliance is presumed. Affiliated Ute, supra, 406 U.S. at 153–54, 92 S.Ct. 1456; Handwerger v. Ginsberg, 519 F.2d 1339, 1342 (2 Cir. 1975).

44. Since August 23, 1974, franchisees are not permitted to sell franchises by order of Judge Conner of the Southern District Court.

45. These general statements concerning Futuristic are not intended to be conclusive on any factual issues to be resolved in the action pending before Judge Conner.

. . .", *SEC v. Manor Nursing, supra,* 458 F.2d at 1100, and bearing in mind their prior association with Koscot, that inference becomes an irresistible one, see *SEC v. Management Dynamics, supra,* 515 F.2d at 809, even though they may not have been Galaxy's leading franchise salesmen.

Whether to enjoin future violations of the registration provisions presents a somewhat more difficult question. Although the court has held Galaxy franchises to be securities, it can hardly be said that the question was free from doubt. The seminal appellate case, *Turner, supra,* was not decided until February 1, 1973, months after both defendants had left Galaxy. Moreover, there is evidence in the record that Galaxy had obtained the opinion of counsel that the federal security laws were not being violated.

The court is nonetheless persuaded, in view of their association with Futuristic, that an injunction against future violations of the registration provisions is also warranted. The defendants, according to their own testimony, are actively involved in Futuristic which, until enjoined by another court, was selling franchises facially similar to those sold by Galaxy and Koscot. This involvement stretches back to January 1973 and covers a period during which the *Turner* and *Koscot* decisions were handed down. Whether Futuristic franchises are securities is not for this court to decide. They are, however, sufficiently similar[46] to indicate that defendants have a conscious propensity to disregard the registration provisions. The SEC has thus demonstrated "a reasonable likelihood of future violations." *SEC v. Manor Nursing, supra,* 458 F.2d at 1101. See also *SEC v. Shapiro, supra,* 494 F.2d at 1308; *SEC v. Management Dynamics, supra,* 515 F.2d at 807.

Accordingly, the defendants are to be permanently enjoined from violating the registration or anti-fraud provisions of the securities law with respect to the sales of any securities in the form of franchise or distributorship interests. *Cf. NLRB v. Express Publishing Company,* 312 U.S. 426, 435, 61 S.Ct. 693, 85 L.Ed. 930 (1941).

## VI. *Disgorgement*

The SEC seeks disgorgement of all benefits received by the defendants to deter future violations by these defendants and others and to ensure that they do not profit from their past wrongdoing. This the court has power to do, *SEC v. Manor Nursing, supra,* 458 F.2d at 1103–04, as long as the relief is remedial, not punitive, in nature. *SEC v. Texas Gulf Sulphur Company,* 446 F.2d 1301, 1308 (2 Cir. 1971).

### *Kirschenblatt*

As explained earlier, Kirschenblatt's primary role in Galaxy involved the retail end of the business and there is evidence that during his approximately one and one-half years with Galaxy he worked full-time and long hours in that connection. The court has concluded that he knowingly aided Galaxy's many violations of the securities laws and that his "salary" was determined by the number of franchises sold. While not desiring to sanction his conduct in this area, the court believes that under the circumstances it would be inequitable to order him to fully disgorge the $18,000–$24,000 he was paid in his capacity as a Galaxy executive. He did, however, benefit unjustly by receiving without payment a distributorship for which other investors had to pay $3,000 in 1971. Accordingly, it is equitable to require him to disgorge the value of that distributorship. Additionally, his sponsoring of McLean into Galaxy constituted the direct exposure of another to the fraudulent promotional scheme and also included serious misrepresentations. Accordingly, Kirschenblatt is ordered to disgorge $3,700 representing the $700 McLean commission and the value of the distributorship he received.

---

**46.** Shevack himself testified that Futuristic is a copy with modifications of Galaxy which was in turn an offshoot of Koscot.

*Shevack*

Shevack testified he received in essence a total of $16,500 for sponsoring others and that half of that sum went to his partner, Cancilla. The court will accept his testimony on these figures and order that he disgorge $8,250.

Based on testimony which the court credits and which was detailed above, it appears that Shevack was both relentless and unscrupulous in his selling activities. It is important to the administration of the securities laws that he not benefit from those illegal actions.

 Shevack testified that he devoted full time to Galaxy while associated with it. From this the court is presumably to draw a distinction between his case and those cases where courts have ordered disgorgement of profits earned through stock transactions without real personal effort. The court concludes, without much difficulty, that working hard at defrauding others provides not a distinction but an additional basis for finding disgorgement to be proper.

The parties shall confer and settle an order in accordance with this opinion on ten (10) days' notice from the date hereof.

SO ORDERED.