**Stanley GROSS, Petitioner,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

**No. 40, Docket 33159.**

United States Court of Appeals
Second Circuit.

Argued Sept. 18, 1969.

Decided Nov. 10, 1969.

---

Melvin A. Albert, New York City (Gordon, Brady, Keller & Ballen, New York City, on the brief), for petitioner.

Paul Gonson, Asst. Gen. Counsel, Securities and Exchange Commission, Washington, D. C. (Philip A. Loomis, Jr., Gen. Counsel, David Ferber, Solicitor, and Harvey A. Rowen, Atty., Securities and Exchange Commission, Washington, D. C., on the brief), for respondent.

Before MOORE, HAYS and ANDERSON, Circuit Judges.

MOORE, Circuit Judge:

### I.

In May, 1965, the Securities and Exchange Commission (the Commission) instituted private administrative proceedings against the broker-dealer firm of Richard Bruce & Co. (Bruce & Co.) and six individuals associated with the firm in connection with transactions in the stock of two speculative issues, Honig's-Parkway, Inc. (Honig's) and Transition Systems, Inc. (Transition). The hearing examiner made findings and ordered remedial action against all respondents. Upon requests for hearing by Gross and others of the individual respondents, the Commission on its own initiative ordered review of the entire record in the Bruce

& Co. proceedings, and on April 30, 1968, issued its own order, together with findings and an opinion.

The hearing examiner had absolved Stanley Gross of any culpable wrongdoing with respect to Bruce & Co.'s fraudulent transactions in the Transition stock but found him guilty of securities fraud violations in the offer and sale of Honig's stock. Gross was suspended by the examiner for a period of two months. The Commission, on the whole record considered *de novo*, see Section 8(a) of the Administrative Procedure Act, 5 U.S.C. § 557(b), reversed the examiner's conclusion that Gross was culpable in the Honig's stock transactions but found him guilty of aiding and abetting the fraud in the offer and sale of Transition stock. The Commission ordered Gross barred from the securities industry, providing, however, that after nine months from the date of the order Gross might become associated with a broker or dealer in a non-supervisory capacity upon making a satisfactory showing that he would be adequately supervised. Gross thereafter filed a petition for rehearing with leave to adduce additional evidence, which was denied by the Commission on December 24, 1968.

Stanley Gross, together with Melvyn Hiller joined the firm of Bruce & Co. in 1957. Hiller became president of the firm, Gross became vice-president and secretary, and George Granat served as treasurer. Granat had been a member of the firm since its registration as a broker-dealer in 1954. These three principals were all substantial shareholders in Bruce & Co., and the record shows that they constituted the executive management of the firm. Gross had at least a 10 per cent proprietary interest by virtue of his capital investment. He was in charge of the firm's trading and "back office" operations, and the Commission, as well as the hearing examiner found that he took "a less active role in registrant's retail sales activities" than the other two principals. Nevertheless, there was some evidence of his participation in the hiring, training and supervision of sales employees as well as his regular attendance at sales meetings. He participated in the profits from the firm's retail sales, and he was well aware of the activity in Transition stock and the mystery surrounding both the product of the issue and its financial status.

Transition, Inc. was incorporated in December, 1960, to develop and market an electronic device known as a "correlator." In February of 1961, its officers met with the principals of Richard Bruce & Co., a registered broker-dealer, to discuss a possible public offering. Stanley Gross attended this meeting, at which the fact was made clear that the Company's prospective product, the "correlator," had not yet been developed nor had any operations begun. The Company's office was at that time located in the law office of one of its officers.

Bruce & Co. agreed to underwrite a public offering, and Bruce's president, Hiller, became a member of Transition's board in September, 1961. In the meantime, the issue had been registered and the offering had been completed by July, 1961. During this period, Transition moved its operations to a plant site in Queens County, New York, and drew about itself a cloak of absolute secrecy. Hiller, a member of Transition's board, was himself unable to garner any information with regard to progress in the development of the "correlator." Nor could anything be ascertained respecting the commercial prospects of the proposed product or Transition's financial status. As a result of this frustration, Hiller resigned from Transition's board of directors in May, 1962.

For six months prior to Hiller's resignation, and throughout the period covering his attempts to obtain concrete information about Transition, wild rumors circulated about the phenomenal prospects of the new "correlator," including reports as to the variety of its uses and indications of active interest by parties ranging from oil companies to the aerospace program, the American Medical Association and the electronics industry. These rumors were not substantiated in

any way, and were in fact contrary to what litle factual information Bruce & Co. possessed at the time the reports were circulating. Despite this chronic lack of information and Bruce & Co.'s suspicion that all the glowing reports were "garbage," [1] salesmen for the firm were permitted to sell and to solicit purchases from customers for several thousand shares of Transition stock. The solicitations of one saleswoman, Mrs. Jeanne Earle, were accompanied by particularly blatant puffing and encouragement of belief in the extravagant rumors, as well as unfounded predictions that the price of the stock would "skyrocket."

The hearing examiner found, and the Commission agreed, that registrant Bruce & Co. had violated the broker-dealer anti-fraud provisions of the Securities and Exchange Act, and its registration was revoked. Bruce & Co. ceased doing business in 1963, and no review was sought from the revocation.

Upon its review of the whole record, the Commission concluded "that in the offer and sale of Transition stock, registrant, together with or willfully aided and abetted by Hiller, Granat and Gross, willfully violated the anti-fraud provisions of Section 17(a) of the Securities Act of 1933 and Sections 10(b) and 15(c) (1) of the Exchange Act and Rules 17 C.F.R. 240.10b–5 and 15c1–2 thereunder." With regard specifically to Stanley Gross, the Commission determined that, by virtue of his participation in the management of the firm and his knowledge both of the firm's activity in Transition stock and the mystery surrounding the issuer, "he must be held responsible along with Hiller and Granat for the fraudulent representations that were made."

The Commission made no finding that Gross himself had made any misrepresentations or that he had participated in the actual sale or solicitation of any of the Transition shares. In its opinion and order denying rehearing filed on December 24, 1968, the Commission additionally observed that its earlier conclusion and order did not rest on any finding of a failure to supervise the transgressing salespersons. Thus Gross's offense was that he "willfully aided and abetted" the commission by his firm and its employees of fraud violations in the offer and sale of the Transition stock, an offense for which he properly may be disciplined pursuant to Section 15(b) (5) (E) and (7) of the Securities Exchange Act, 15 U.S.C. 78o(b) (5) (E) and (7).

In his petition for review, Gross contends that he could not properly be held responsible for the firm's fraud because no evidence appears in the record to connect him personally with any representations found to be fraudulent or to show his actual knowledge of any specific misrepresentation. He contends that the Commission's conclusion that he was responsible for the firm's fraud rests solely on impermissible inferences from inconclusive evidence which he cites from the record. Thus he attacks inferences of direct knowledge on his part which the Commission may have drawn from proof of certain alleged representations made by Hiller, from Hiller's failure to supervise the offending salesman and from certain proven representations made by Mrs. Earle. In so doing, petitioner Gross ignores the actual basis of the Commission's holding against him and the substantial evidence to support it in the record.

Petitioner's confusion may perhaps arise from the somewhat misleading manner in which the issue was framed on this appeal. He insists that he was held liable by the Commission "for the violations of Hiller in the sale of Transition stock," and he has presented his argu-

---

1. One of the witnesses, an employee of Bruce & Co., testified that when she told Hiller of reports being circulated that the correlator was already developed and could detect cancer, among other things, he reacted with the statement that "it was a lot of garbage." Another witness testified that at one point during the period when the rumors were circulating, Stanley Gross responded to an inquiry by a customer that he was "in the dark" about Transition and the correlator.

ment accordingly. The Commission, as respondent, has similarly argued that "there was substantial evidence that petitioner * * * violated antifraud provisions of the federal securities laws in connection with the firm's policy" of allowing solicitation of purchases in the Transition stock. Yet the Commission, in its order barring Gross and the other respondents, concluded merely that "in the offer and sale of Transition stock, registrant, together with *or willfully aided and abetted by* Hiller, . Granat and Gross, willfully violated the anti-fraud provisions" of the federal securities laws. (Emphasis added.)

The conclusion with regard to Gross was predicated on the Commission's finding that Gross, among other things, "actively participated in managing its [registrant's] affairs" and that he "attended sales meetings, shared in the profits from registrant's retail sales, and knew or should have known of the improper activities." There is substantial evidence in the record that Gross was one of three "principals" in the firm by virtue of both his financial investment and his position of authority in the management of the firm, although his management responsibilities were not in the specific area of retail sales. There is substantial evidence that he regularly attended both sales meetings and policy sessions, and he does not deny that he was one of the principals representing Bruce & Co., in the initial underwriting negotiations with Transition. The record also supports the conclusion that Gross was aware of the inadequacy of the information available with regard to Transition and also aware of the active solicitation of Transition stock purchases by representatives of his firm notwithstanding the deficiency of information.

■ The Commission found, with respect to Bruce & Co., a pattern of "registrant authorizing, if not encouraging, the solicitation of orders for a speculative stock on the basis of unconfirmed and extravagent reports or rumors" in derogation of "the basic obligation of a broker-dealer to deal fairly with the invest-

ing public." See MacRobbins & Co., Inc., 41 S.E.C. 116 (1962), aff'd sub nom. Berko v. S. E. C., 316 F.2d 137 (2d Cir. 1963). On the basis of Stanley Gross's participation in the management of the firm and his knowledge of the course of conduct in which his firm was engaging with respect to Transition, Inc. securities, the Commission could have concluded that he "aided and abetted" activities of the firm which were found to be in violation of the federal securities law anti-fraud provisions. There is substantial evidence in the record to support that conclusion, and we affirm the Commission.

■ Gross argues additionally that even if some disciplinary action by the Commission was authorized by law on the evidence against him, the sanctions ultimately imposed by the Commission were, under the circumstances of his "passive" violation, ."excessive, harsh, arbitrary and unjust." He offers the further argument that the bar imposed by the Commission was improper because it was substantially more severe than the suspension ordered by the hearing examiner in the initial decision. The fact that the Commission differed with the examiner in the matter of sanctions is of no legal significance. Fink v. Securities and Exchange Commission, 417 F.2d 1058 (2d Cir. October 27, 1969) ; Hanly et al. v. Securities and Exchange Commission, 415 F.2d 589, 597–599 (2d Cir. 1969). Moreover, the Commission has very broad discretion in determining the sanctions which will best protect the public interest, and "only upon a showing of abuse of discretion—such as the imposition of a sanction unwarranted in law or without justification in fact—will a reviewing court intervene in the matter of sanctions." *Hanly, supra,* 415 F.2d at 598, *accord,* American Power § Light Co. v. Securities and Exchange Commission, 329 U.S. 90, 112–113, 67 S.Ct. 133, 91 L.Ed. 103 (1946).

Having affirmed the Commission's conclusion of law and its determination of fact as supported by substantial evidence in the record, we will not intervene

with regard to the sanctions. We note, however, that the avenue remains open for Gross, his present employer or any future employer to make application to the S.E.C. for review of the sanction and possibly removal of the condition which currently precludes his employment in a supervisory capacity, or in any capacity without a showing of adequate supervision, if the facts then warrant such reconsideration. See Vanasco v. Securities and Exchange Commission, 395 F.2d 349, 353 (2d Cir. 1968).

## II.

Gross did not testify in his own behalf during the hearing conducted by the examiner in 1965. The reason given for his failure to testify was that counsel at that time advised him it was unnecessary, since the Commission had no case against him. Subsequent to the Commission's disciplinary order entered against him, Gross petitioned for rehearing with leave to adduce additional evidence, hoping to be allowed to present his testimony. The petition was denied. Gross concedes that the granting or denial of such a request is discretionary with the Commission, see Merritt, Vickers, Inc. v. Securities and Exchange Commission, 353 F.2d 293, 297 (2d Cir. 1965) but urges that denial of his request under the circumstances was an abuse of discretion.

The Commission is authorized to reopen a hearing and take new evidence upon the filing of an application which shows to its satisfaction that the additional evidence is material and "that there were reasonable grounds for failure to adduce such evidence at the hearing." Rule 21(d), Securities and Exchange Commission Rules of Practice, 17 C.F.R. 201.21(d). The only ground asserted for Gross's failure to testify is the judgment of counsel at the time of the original hearings, which petitioner's present counsel has now concluded was unwise. We agree with the Commission that "[p]ublic policy considerations favor the expeditious dispo-

sition of litigation, and a respondent cannot be permitted to gamble on one course of action and, upon an unfavorable decision, to try another course of action." David T. Fleischman, Securities Exchange Act Release No. 8187, pp. 3–4 (November 1, 1967), quoted by the Commission in the present order.

For the reasons given, we affirm the Commission with respect to both orders.