**612**

SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff-Appellee,

v.

Peter E. AARON, Defendant-Appellant,

and

E. L. Aaron & Co., Inc., Lawn-A-Mat
Chemical & Equipment Corp., Edward L.
Aaron, Peter E. Aaron, Norman Law-
rence Schreiber, Donald Darwin Jacob-
son, Daniel Dorfman, and Fernando Era-
zo, Defendants.

No. 830, Docket 77–6091.

United States Court of Appeals,
Second Circuit.

Argued March 3, 1978.

Finally submitted Dec. 8, 1978.

Decided March 12, 1979.

Certiorari granted October 15, 1979.

Certiorari Granted Oct. 15, 1979.
See 100 S.Ct. 227.

Paul Gonson, Associate Gen. Counsel, S. E. C., Washington, D. C. (Harvey L. Pitt, Gen. Counsel, Jacob H. Stillman, Asst. Gen. Counsel, Angela M. Desmond and Glynn L. Mays, Attys., S. E. C., Washington, D. C., on the brief), for plaintiff-appellee.

Bert L. Gusrae, New York City (John B. Lowy, and Gusrae, Greene & Kaplan, New York City, on the brief), for defendant-appellant.

Before ANDERSON, FEINBERG and TIMBERS, Circuit Judges.*

TIMBERS, Circuit Judge:

On this appeal from a permanent injunction entered after an evidentiary hearing in the Southern District of New York, Lee P. Gagliardi, *District Judge*, [1977–1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,043 (S.D.N.Y. May 5, 1977), enjoining Peter E.

---

* Pursuant to § 0.14 of the Rules of this Court, this appeal is being determined by Judges Feinberg and Timbers who are in agreement on this opinion. Judge Anderson, who heard the argument, unfortunately died on May 2, 1978. Prior to his death Judge Anderson voted to affirm and was in agreement with his colleagues on all issues in the case. He did not have the opportunity, however, to see this opinion prior to his death.

Aaron from violating the registration and antifraud provisions of the federal securities laws, we find the following to be the essential issues presented:

(1) Whether the district court erred in holding that Aaron's managerial and supervisory responsibilities with a broker-dealer firm, despite his lack of corporate title, made him subject to a permanent injunction enjoining him from violating the registration and antifraud provisions of the federal securities laws.

(2) Whether the district court erred in holding that Rule 144 under the 1933 Act does not provide an exemption from the registration provisions of that Act for controlling persons who sold shares, allegedly pursuant to Rule 144, to a broker who then sold them to a second broker for public sale without compliance with Rule 144.

(3) Whether the district court erred in holding that the SEC is not required to establish scienter as an element of a government enforcement action to enjoin violations of § 10(b) of the 1934 Act or of § 17(a) of the 1933 Act.

(4) Whether the district court erred in granting the permanent injunction under all the circumstances of this case.

For the reasons below, we agree in all respects with the district court's holdings on the essential issues stated above. We affirm in its entirety the permanent injunction as entered.

## I.

We assume familiarity with Judge Gagliardi's excellent district court opinion. We accept his adequate findings of fact, Fed.R.Civ.P. 52(a), and we agree with his conclusions of law. We summarize here only those facts necessary to an understanding of our rulings on the legal issues stated above.

(A) *Peter Aaron's Responsibilities With E. L. Aaron & Co.*

During the period in question, appellant Peter E. Aaron ("Aaron") was employed by E. L. Aaron & Co. ("Aaron & Co." or "the firm"). Aaron & Co. was a broker-dealer registered with the Securities and Exchange Commission ("SEC"). The firm's principal office was in New York City. Aaron's father, Edward L. Aaron, was president and sole shareholder of Aaron & Co.

Aaron had been employed by the firm for 15 years. He served as his father's assistant. He was the firm's trouble shooter and the liaison between the firm's various departments, including operations, sales and the trading room.

Aaron maintained the so-called due diligence files for securities in which the firm made markets. In connection with his supervision of the firm's sales force, Aaron conducted sales meetings with registered representatives. At these meetings sales techniques were discussed. He also monitored the registered representatives' trading—by advising them of their monthly production figures, by informing them when any of their clients were late in payment, and by discouraging the representatives from exceeding their individual selling capacities.

As compensation for his services, Aaron received salary, bonuses and expenses at a level comparable to that of his father, the firm's president. Aaron, however, was not registered with the National Association of Securities Dealers ("NASD") as a principal of Aaron & Co. He held no corporate office in the firm.

(B) *Offer And Sale Of Lawn-A-Mat Stock*

In November 1974, Aaron & Co. opened a branch in Roslyn Heights, New York. Norman Schreiber, a registered representative of Aaron & Co., was appointed branch manager of the new office. Donald Jacobson, also an Aaron & Co. registered representative, was assigned to assist Schreiber. The Roslyn Heights office was essentially a two-man operation.

From November 1974 through September 1975, Aaron & Co. made a market in the common stock of Lawn-A-Mat Chemical & Equipment Corp. ("LAM"). In doing so, Schreiber and Jacobson contacted stockholders of LAM and its franchise-dealers by phone and by mail to solicit orders for LAM stock. In the course of this promotion, Schreiber and Jacobson made false and misleading statements to prospective purchasers of LAM. Among the statements made were some to the effect that LAM was planning or in the process of manufacturing a new type of small car and a tractor. In fact LAM had no plans to manufacture a car or tractor. Schreiber and Jacobson also made projections of substantial increases in the price of LAM stock and misleading statements about LAM's financial condition. There was no basis in fact for these projections and statements, since LAM had experienced significant losses during the period involved.

Some of the persons contacted complained to LAM officers about these statements. The LAM officers informed both Schreiber and Jacobson that their statements were false.

When the false and misleading statements continued despite these warnings, LAM's attorney contacted Aaron. He did so twice by telephone during the period involved, informing Aaron of the continuing false and misleading statements by his sales representatives.

Since Aaron was in charge of LAM's due diligence files, he had ample independent reason to know that the information about LAM being disseminated by Schreiber and Jacobson was untrue. Although Aaron notified Jacobson of the LAM attorney's complaint, he did nothing whatsoever to stop the false and misleading statements being made by Schreiber and Jacobson.

(C) *The Aaron & Co./J. W. Weller & Co./Dorfman Transactions*

In November 1974, a representative of Aaron & Co. telephoned Daniel Dorfman, who was then the president, principal stockholder and a director of LAM, to solicit the sale by Dorfman of 1,000 shares of LAM common stock. Since Dorfman was a controlling person of LAM, his shares could not be sold unless registered under § 5 of the 1933 Act or unless the sale of the unregistered shares qualified for an exemption from registration pursuant to Rule 144 under the 1933 Act. In view of the fact that Aaron & Co. precipitated the entire transaction by arranging for the sale of shares from Dorfman to J. W. Weller & Co., Inc. ("Weller") and by soliciting customers' buy orders in anticipation of the transfer of the shares from Weller to Aaron & Co., the sale of the shares to the public obviously did not qualify for a Rule 144 exemption, as we hold below.

In an attempt to enable Aaron & Co. to sell Dorfman's unregistered shares without qualifying for a Rule 144 exemption, the firm arranged the following transaction. Aaron contacted Weller, another broker-dealer, and suggested that Weller act as an intermediary for sales from Dorfman to Aaron & Co. The proposal was that Dorfman would sell his shares to Weller which, as "agent" of the selling shareholder, would sell the shares to Aaron & Co., which in turn would solicit buyers for the shares. Weller agreed. The transaction was consummated. Daniel Dorfman sold 1,000 shares.

Similarly, in February 1975, a representative of Aaron & Co. persuaded Fred Dorfman, who was then vice-president and a director of LAM, to sell 20,000 shares of LAM common stock in the same manner. As with Daniel Dorfman, Fred Dorfman was a controlling person. He was directed to transfer his shares to Weller, which in turn delivered them to Aaron & Co. for public sale.

The SEC commenced the instant enforcement action in the district court on February 26, 1976. It sought preliminary and final injunctive relief pursuant to § 20(b) of the 1933 Act, 15 U.S.C. § 77t(b) (1976), and § 21(d) of the 1934 Act, 15 U.S.C. § 78u(d) (1976). The complaint charged Aaron and

three other defendants with violating, and aiding and abetting violations of, the registration provisions of §§ 5(a) and 5(c) of the 1933 Act, 15 U.S.C. §§ 77e(a) and 77e(c) (1976). The complaint also charged Aaron and seven other defendants with violating, and aiding and abetting violations of, the antifraud provisions of § 17(a) of the 1933 Act, 15 U.S.C. § 77q(a) (1976), § 10(b) of the 1934 Act, 15 U.S.C. § 78j(b) (1976), and Rule 10b–5 promulgated under the 1934 Act, 17 C.F.R. § 240.10b–5 (1978). The seven defendants other than Aaron consented to the entry of permanent injunctions against them.

After a three day evidentiary hearing, Judge Gagliardi on May 5, 1977 filed a comprehensive, well reasoned opinion, holding that Aaron had violated the registration and antifraud provisions as charged in the complaint; and that the SEC was entitled to a permanent injunction enjoining Aaron from further such violations.

From the final judgment entered on Judge Gagliardi's opinion, the instant appeal has been taken.

## II.

In the light of these facts and prior proceedings, we turn first to the question whether Aaron, despite his lack of official title, was properly enjoined pursuant to § 20(b) of the 1933 Act and § 21(d) of the 1934 Act[1] from violating the registration and antifraud provisions of the federal securities laws—on the basis of violations committed by the brokerage firm's registered representatives. We hold that, because Aaron exercised managerial and su-

pervisory authority over the firm, he was equally responsible for the fraudulent representations made by the firm's salesmen. The permanent injunction was properly entered against him.

Several courts have held that managerial and supervisory personnel who hold official titles in a broker-dealer firm have a duty to prevent or halt actions by firm employees in violation of the federal securities laws. *See, e. g., Gross v. SEC,* 418 F.2d 103 (2 Cir. 1969) (Moore, J.); *Stevens v. Abbott, Proctor & Paine,* 288 F.Supp. 836, 847 (E.D.Va. 1968). The presence or absence of an official title, however, has not been a decisive factor in determining liability. Thus, in *Gross v. SEC, supra,* we affirmed a decision by the Commission holding that the vice-president of a broker-dealer was liable under § 10(b) of the 1934 Act and § 17(a) of the 1933 Act for aiding and abetting actions by the firm and its employees which were found to be in violation of the antifraud provisions of the Acts. Although Gross held the official title of vice-president, Judge Moore did not focus on his status as an officer, but instead emphasized his "participation in the management of the firm." 418 F.2d at 107.

This is not the only context in which our decision has turned on a defendant's functions within the firm, rather than on his official title. In *Colby v. Klune,* 178 F.2d 872, 873 (2 Cir. 1949), we held that the absence of an official title does not preclude liability under § 16(b) of the 1934 Act, 15 U.S.C. § 78p(b) (1976). We held that the term " 'officer' " as used in § 16(b) should be interpreted in light of the duties performed by the particular corporate employ-

---

1. Section 20(b) of the 1933 Act, 15 U.S.C. § 77t(b) (1976), provides in relevant part:

"Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this subchapter, or of any rule or regulation prescribed under authority thereof, it may in its discretion bring an action in any district court of the United States . . . to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond."

Section 21(d) of the 1934 Act, 15 U.S.C. § 78u(d) (1976), provides in relevant part:

"Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter, the rules or regulations thereunder . . . it may in its discretion bring an action in the proper district court of the United States . . . to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond."

ee and that "[i]t is immaterial how his functions are labelled." 178 F.2d at 873. Similarly, in *SEC v. Galaxy Foods, Inc.,* 417 F.Supp. 1225, 1247 (E.D.N.Y.1976), *aff'd mem,* 556 F.2d 559 (2 Cir.), *cert. denied,* 434 U.S. 855 (1977), the district court, in granting injunctive relief, emphasized the defendants' involvement in the firm's actions rather than their official status within the firm.

Appellant here claims that his lack of corporate title insulates him from liability based on the actions of the firm's employees. This claim, if upheld, would seriously undermine the purposes of the antifraud provisions of the securities laws and deprive customers of brokerage firms of the protections which they expect when dealing with professionals in the industry. As the Supreme Court observed in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 203 (1976), § 10(b) of the 1934 Act was designed as a "catch-all clause" to enable the Commission to deal with new manipulative devices. Courts have been extremely flexible in interpreting the requirements of this section.

Consistent with this pragmatic approach, we hold that appellant's lack of corporate title does not foreclose the entry against him of a permanent injunction based on the clearly fraudulent activities of the firm's representatives.[2] The district court found that, while Aaron never registered as a principal with the NASD[3] nor held an official title at Aaron & Co., he participated in management decisions, monitored the trading of the firm's representatives, and, with his father, exercised supervisory responsibilities over the firm's employees. *SEC v. E. L. Aaron & Co., Inc.,* [1977–1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,043 at 91,684 (S.D.N.Y. May 5, 1977). Moreover, the evidence clearly supports the district court's finding that Aaron had supervisory responsibilities over the Roslyn Heights branch office.

Based on his participation in the management of the firm and his supervisory responsibilities, we hold that Aaron aided and abetted the violations by the firm's salesmen and therefore is subject to a permanent injunction. To permit the management of broker-dealers to avoid the consequences of their supervisory responsibilities and thus to escape injunctive and other liability imposed upon them by the antifraud provisions of the federal securities laws merely because they lack corporate title, would create a peculiarly vacuous and pernicious distinction. We decline to do so.

### III.

We turn next to the question whether, under Rule 144,[4] the sale of unregistered LAM stock by controlling persons of LAM to Weller & Co., and ultimately to Aaron & Co. for resale to the public, is exempt from the registration requirements of § 5 of the 1933 Act.[5] We hold that this sham transaction is not exempt under Rule 144.

---

2. The district court found that two of the firm's registered representatives made a number of serious and blatant misrepresentations to Aaron & Co. customers concerning aspects of LAM's activities and financial condition. With the exception of certain statements regarding LAM's plans to build a car and tractor, appellant does not dispute that these false statements were made. He does contend, however, that there was insufficient evidence to support the district court's finding that LAM was not manufacturing a car or tractor and did not plan to do so. After reviewing the record, we hold that the district court's finding was not clearly erroneous, Fed.R.Civ.P. 52(a), but indeed was supported by the evidence.

3. Appellant contends that, since he was not registered as a principal with the NASD, he can not be held liable for violations at an office already managed by a registered principal. In view of our holding that a defendant's liability depends upon the extent and nature of his responsibilities and not on his title, we hold that the district court properly rejected appellant's contention. Moreover, we find no error in the court's refusal to receive in evidence an exchange of certain letters relating to Aaron's need to register with the NASD. In view of our holding, these letters were irrelevant to the issue of whether Aaron aided and abetted violations of the securities laws.

4. 17 C.F.R. § 230.144 (1978).

5. 15 U.S.C. § 77e (1976).

Section 5 of the 1933 Act, read in conjunction with §§ 4(1) and 2(11) of the 1933 Act,[6] prohibits the issuer of any security or controlling persons of the issuer from selling or offering to sell a security in interstate commerce unless a registration statement is in effect. The registration statement is designed to assure public access to material facts bearing on the value of publicly traded securities and is central to the Act's comprehensive scheme for protecting public investors. *See generally SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1952). Accordingly, any exemption from this requirement must be strictly construed. *Milnarik v. M–S Commodities, Inc.*, 320 F.Supp. 1149, 1151 (N.D.Ill.1970), *aff'd*, 457 F.2d 274 (7 Cir.) (Stevens, J.), *cert. denied*, 409 U.S. 887 (1972). *See SEC v. Ralston Purina Co., supra*, 346 U.S. at 126; *SEC v. North American Research & Development Corp.*, 424 F.2d 63, 71–72 (2 Cir. 1970).

Two such exemptions are those provided for in § 4(4) of the 1933 Act, 15 U.S.C. § 77d (1976), and in Rule 144. Section 4(4) provides an exemption from registration for "brokers' transactions executed upon customers' orders . . . but not the solicitation of such orders." The Commission in Rule 144 has clarified the meaning of "brokers' transactions" by defining them to encompass only transactions where a broker

"(1) Does no more than execute the order or orders to sell the securities *as agent* for the person for whose account the securities are sold. . . .;

(2) Neither solicits nor arranges for the solicitation of customers' orders to buy the securities in anticipation of or in connection with the transaction . . . ." (emphasis added). Rule 144(g), 17 C.F.R. § 230.144(g) (1978).

Appellant argues that these exemptions are applicable to the Dorfmans' sale of LAM stock to Weller & Co. and the subsequent sale to Aaron & Co. and, therefore, that registration was not required. We disagree.

It is clear that, if Aaron & Co. had purchased the Dorfmans' shares directly from the Dorfmans and then had attempted to sell such shares to the public, with all other circumstances remaining the same, the transaction would have failed to comply with the exemption requirements for two reasons. First, with respect to the sale of LAM shares by the Dorfmans, Aaron & Co. solicited the sale of LAM shares with an eye to acquiring the shares for its own account; thus, Aaron & Co., by acting as *principal* for its own account rather than as *agent* of the seller, would not have complied with the requirement of Rule 144(g)(1). Second, Aaron & Co., by engaging in the solicitation of customers' orders to buy LAM shares in anticipation of the Dorfman sale, would have failed to comply with § 4(4) and Rule 144(g)(2).

Aaron & Co., however, did not purchase the shares directly from the Dorfmans. In order to circumvent the restrictions of Rule 144 and § 4(4), Aaron & Co. concocted a scheme which called for interposing another brokerage firm—Weller & Co.—to act as middleman in the transaction. Weller & Co. would purchase the shares from the Dorfmans and then, pursuant to a prearranged agreement, would resell the shares to Aaron & Co. Although the scheme clearly was an attempt to obfuscate the true nature of the transaction and to evade the intent of the exemption restrictions, appellant nevertheless argues that the transaction technically complied with the Rule.

We hold that the fact that Aaron & Co. did not purchase the shares directly from the controlling persons is inconsequential. Aaron & Co. still precipitated the entire transaction. They solicited the sale of shares from the Dorfmans. They determined the price. They introduced the Dorfmans to Weller & Co. and arranged for the sale of shares from the Dorfmans to Weller & Co. and then from Weller & Co. to Aaron

---

**6.** Section 4(1) of the 1933 Act, 15 U.S.C. § 77d(1) (1976), makes § 5 inapplicable to transactions by anyone "other than an issuer, underwriter or dealer." Section 2(11) of the 1933 Act, 15 U.S.C. § 77b(11) (1976), defines "issuer" as including, *inter alia,* "any person directly or indirectly controlling . . . the issuer." Appellant concedes that the Dorfmans were controlling persons of LAM for purposes of the 1933 Act.

& Co. Moreover, they solicited customers' buy orders in anticipation of the acquisition of the Dorfmans' unregistered shares. If we were to sanction this obviously sham transaction, we would be undermining the statutory requirement of registration when securities are transferred from controlling persons into the market. We decline to do so. We hold that the transaction failed to comply with the restrictions of Rule 144 and § 4(4).[7]

## IV.

■ We turn next to appellant's claim that the district court erred in holding that the SEC is not required to establish scienter as an element of a government enforcement action to enjoin violations of § 10(b) of the 1934 Act or of § 17(a) of the 1933 Act.

### (A) SECTION 10(b) OF THE 1934 ACT.

In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976), the Court held that proof of scienter is a necessary element in a private damage action under § 10(b).[8] The Court, however, explicitly left open the question whether scienter would be required in future injunction actions. 425 U.S. at 194 n. 12. In granting the permanent injunction below, the district court found that appellant's conduct in connection with the misleading statements was sufficient to establish scienter.[9] Nevertheless, we find it unnecessary to reach the question whether Aaron's conduct would support a finding of scienter, since we hold that the scienter requirement enunciated in *Hochfelder* is not applicable to government enforcement actions brought under §§ 10(b) and 21(d) of the 1934 Act. Consistent with the pre-*Hochfelder* decisions of this Court, we continue to hold that allegations and proof of negligence alone will suffice, for the reasons stated below.

Although various courts[10] and commentators[11] have examined the question of

7. The SEC recently has promulgated an amendment to Rule 144 which permits a person selling securities under the rule to deal directly with a market maker in lieu of engaging a broker. Securities Act Release No. 5979, reprinted in [1978 Trnasfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 81,731 (Sept. 19, 1978). Previously, a seller was forbidden from dealing directly with a market maker since the latter is continuously soliciting orders for shares. The Commission, however, now views the rule's requirements as "more stringent than necessary," *id.* at 80,930, and has revised the rule specifically to permit a seller to deal with a market maker.

The amendment, however, does not alter in any way our holding in the instant case. Aside from the fact that the amended rule was not in effect at the time of the instant transaction, the Commission explicitly has noted, "[t]he prohibitions against the solicitation of buy orders . . . have not been changed and therefore will continue to apply." *Id.* at 80,931. Thus, had the Dorfmans approached Aaron & Co. about a possible sale of LAM stock, the amended rule would have permitted Aaron & Co. to buy from the Dorfmans. However, the amended rule still would have prohibited Aaron & Co.'s actions in soliciting the Dorfmans to sell and in soliciting other customer buy orders in anticipation of the purchase of the Dorfmans' shares.

8. The Court defined scienter as "intent to deceive, manipulate, or defraud," 425 U.S. at 193 (footnote omitted). Various commentators

nevertheless have debated what the Court meant by that definition. *See, e. g.,* Bucklo, The Supreme Court Attempts to Define Scienter Under Rule 10b–5: *Ernst & Ernst v. Hochfelder,* 29 Stan.L.Rev. 213 (1977); Haimoff, Holmes Looks at *Hochfelder* and 10b–5, 32 Bus.Law. 147 (1976); The Supreme Court, 1975 Term, 90 Harv.L.Rev. 56, 259 & nn.47 and 48 (1976); Note, Recklessness Under Section 10(b): Weathering the *Hochfelder* Storm, 8 Rutgers-Camden L.J. 325, 342–51 (1977). Since we hold that scienter is not a requisite element of a government injunction action, we need not determine in this context what constitutes scienter within the Supreme Court's definition in *Hochfelder.*

9. The district court stated:
"While negligence alone may suffice as a standard for liability in Commission enforcement proceedings, . . . the fact that Peter Aaron intentionally failed to terminate the false and misleading statements made by Schreiber and Jacobson, knowing them to be fraudulent, is sufficient to establish his scienter under the securities laws." *SEC v. E. L. Aaron · & Co., supra,* [1977–1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,043 at 91,-685.

10. *Compare* those cases which have held that scienter is required, *e. g., SEC v. Blatt,* 583 F.2d 1325 (5 Cir. 1978); *SEC v. Wills,* 472 F.Supp. 1250 (D.C.D.C. 1978); *SEC v. Cenco, Inc.,* 436 F.Supp. 193, 200 (N.D.Ill.1977); *SEC v. Bausch*

11. See note 11 on p. 620.

what degree of culpability is required for injunction actions after *Hochfelder*, we have not had the occasion to rule squarely on that issue to date.[12] Accordingly, our analysis must begin with the reasoning of the Supreme Court in *Hochfelder* itself.

In holding that scienter is required for private damage actions under § 10(b), the Supreme Court in *Hochfelder* relied on three factors: (1) the language of § 10(b); (2) the legislative history of the 1934 Act; and (3) the relationship of § 10(b) to the other express civil remedies[13] and the effect of a scienter requirement on the overall statutory scheme of the securities laws. Looking first to the language of § 10(b), the Court observed that the use of the words "manipulative" and "deceptive" in conjunction with "device or contrivance" indicated an intent to proscribe "only knowing or intentional misconduct." 425 U.S. at 197. Examination of the legislative history of § 10(b) and its relationship to other provisions of the securities laws reinforced the Court's conclusion that scienter was required for private damage actions under § 10(b). *Id.* at 201–11.

It has been suggested that the analysis employed in *Hochfelder* should apply with equal force to the question of scienter as a requisite element in a government injunction action. *SEC v. Blatt*, 583 F.2d 1325, 1333 (5 Cir. 1978). *See also Ernst & Ernst v. Hochfelder, supra*, 425 U.S. at 217 (Blackmun, J., dissenting—"the question whether negligent conduct violates the Rule should not depend upon the plaintiff's identity.") For the reasons below and especially in the light of the carefully reasoned pre-*Hochfelder* decisions of this Court, we believe that there are compelling distinctions between private damage actions and government injunction actions so far as the scienter requirement is concerned.

Long before the Supreme Court's holding in *Hochfelder*, our Court had construed the language of § 10(b) to require scienter in the context of private damage actions. *See, e. g., Lanza v. Drexel*, 479 F.2d 1277, 1301, 1305–06 (2 Cir. 1973) (en banc); *Shemtob v. Shearson, Hammill & Co.*, 448 F.2d 442, 445 (2 Cir. 1971); *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 868 (2 Cir. 1968) (en banc) (Friendly, J., concurring), *cert. denied*, 394 U.S. 976 (1969). On the other hand, we uniformly have held that the lan-

& *Lomb, Inc.*, 420 F.Supp. 1226, 1241 (S.D.N.Y.), *aff'd on other grounds*, 565 F.2d 8 (2 Cir. 1977) (not reaching scienter issue) *with* those cases which suggest negligence will suffice, *e. g., SEC v. World Radio Mission*, 544 F.2d 535, 541 n.10 (1 Cir. 1976). Still other courts have discussed the question but have found it unnecessary to rule squarely on the issue. *E. g., SEC v. Geotek*, 426 F.Supp. 715, 726 (N.D.Cal.1976), *aff'd sub nom. SEC v. Arthur Young & Co.*, [Current] Fed.Sec.L.Rep. (CCH) ¶ 96,766 (9 Cir. Feb. 1, 1979); *SEC v. Savoy Industries, Inc.*, 587 F.2d 1149 (D.C. Cir. 1978); *SEC v. American Realty Trust*, 586 F.2d 1001 (4 Cir. 1978); *Edward J. Mawod & Co. v. SEC*, 591 F.2d 588 (10 Cir. 1979).

11. Berner & Franklin, Scienter and Securities and Exchange Commission Rule 10b–5 Injunctive Actions: A Reappraisal in Light of *Hochfelder*, 51 N.Y.U.L.Rev. 769 (1976); Haimoff, *supra*, 32 Bus.Law. at 166; Harkleroad, Requirements for Injunctive Actions Under The Federal Securities Laws, 2 Journal of Corp. Law 481 (1977); Note, The Scienter Requirement in SEC Injunctive Enforcement of Section 10(b) After *Ernst & Ernst v. Hochfelder*, 77 Colum.L.Rev. 419 (1977); Note, Scienter and Injunctive Relief Under Rule 10b–5, 11 Ga.L.

Rev. 879 (1977); Comment, Scienter and SEC Injunctive Suits, 90 Harv.L.Rev. 1018 (1977); Note, SEC Enforcement Actions to Enjoin Violations of Section 10(b) and Rule 10b–5: The Scienter Question, 5 Hofstra L.Rev. 831 (1977); Note, Scienter's Scope and Application In Light of *Hochfelder*, 52 Notre Dame Law. 925 (1977).

12. *SEC v. Coven*, 581 F.2d 1020, 1026 n.10 (2 Cir. 1978), *cert. denied* —— U.S. ——, 99 S.Ct. 2043, 60 L.Ed.2d 403 (1979); *SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 102 (2 Cir. 1978); *Arthur Lipper Corp. v. SEC*, 547 F.2d 171, 180–81 n.6 (2 Cir. 1976), *cert. denied*, 434 U.S. 1009 (1978); *SEC v. Universal Major Industries*, 546 F.2d 1044, 1047 (2 Cir. 1976).

13. The Court noted that Congress, in structuring express civil remedies under the securities acts, clearly specified whether recovery was to be premised on negligence or knowing and intentional conduct. 425 U.S. at 207. To permit recovery of damages under § 10(b) for negligent conduct would "nullify the effectiveness of the carefully drawn procedural restrictions on these express actions." *Id.* at 210.

guage and history of the section does not require a showing of scienter in an injunction enforcement action brought by the Commission. *See, e. g., SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 809 (2 Cir. 1975); *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1096 (2 Cir. 1972); *Hanly v. SEC,* 415 F.2d 589, 596 (2 Cir. 1969); *SEC v. Texas Gulf Sulphur Co., supra,* 401 F.2d at 854. In view of the policy considerations underlying the securities acts, it has been our view that the increased effectiveness of government enforcement actions predicated on a showing of negligence alone outweighed the danger of potential harm to those enjoined from violating the securities laws. *See, e. g., SEC v. Spectrum, Ltd.,* 489 F.2d 535, 541–42 (2 Cir. 1973); *SEC v. Texas Gulf Sulphur Co., supra,* 401 F.2d at 854–55, 868. Our decisions uniformly have held that a negligence standard should be applied in a government enforcement action because such actions are brought for the purpose of providing maximum protection for the investing public, as contrasted with the purpose of private damage actions which are brought to obtain monetary relief for individual investors. *See SEC v. Manor Nursing Centers, Inc., supra; Hanly v. SEC, supra.* This distinction was succinctly stated in our recent decision in *SEC v. Coven, supra,* 581 F.2d at 1027–28 (Mansfield, J.):

> "The essential nature of an SEC enforcement action is equitable and prophylactic; its primary purpose is to protect the public against harm, not to punish the offender."

The Court's decision in *Hochfelder* in our view has not altered the fact that different policy considerations should govern in SEC enforcement actions, in contrast to private damage actions, under § 10(b). Indeed, the Court itself appears to have recognized this when it expressly left open the question now before us. 425 U.S. at 194 n.12.

Moreover, an examination of the same three factors that the Supreme Court relied on in concluding that scienter is required for private damage actions under § 10(b) indicates to us that scienter should not be

required in a government enforcement action.

The first factor—the language of § 10(b) —of course is the same regardless of whether the action is brought by the SEC or a private individual. Contrary to appellant's assertions, however, we do not believe that the language of the section alone is determinative of the issue. As the judicial interpretation of the section demonstrates, different courts have construed the language differently. *See* The Supreme Court, 1975 Term, *supra* note 8, at 258 & n.35; Note, 77 Colum.L.Rev., *supra* note 11, at 425 n.43. Where the statutory language is unclear, the Supreme Court has held that resort to legislative history and purpose is proper. *See, e. g., Train v. Colorado Public Interest Research Group,* 426 U.S. 1, 10 (1976); *Cass v. United States,* 417 U.S. 72, 78 (1974); *Perry v. Commerce Loan Co.,* 383 U.S. 392 (1966); *NLRB v. Fruit & Vegetable Packers,* 377 U.S. 58, 62 (1964); *Cox v. Roth,* 348 U.S. 207, 209 (1955); *United States v. Rosenblum Truck Line Association,* 315 U.S. 50 (1942).

As the Court stated in *Hochfelder,* however, the legislative history of § 10(b) is "bereft of any explicit explanation of Congress' intent." 425 U.S. at 201. Pointing out that the 1934 Act as a whole was aimed at clearly intentional fraud, the Court nevertheless concluded, in the context of an implied right of action for damages, that the legislative history of the section did not conflict with the conclusion the Court reached through textual analysis of the section.

The Court in *Hochfelder* was dealing with the question of a judicially implied right of action, as to which it is not surprising that there was very little legislative history on the scienter issue. In the past, our Court has looked for guidance in defining the requirements for a private right of action under § 10(b) to the common law of misrepresentation and deceit. *Lanza v. Drexel, supra,* 479 F.2d at 1291–93, 1306. In defining the requirements for an SEC injunction action based on violations of § 10(b), however, we have looked to § 21(d)

[formerly § 21(e)] of the 1934 Act, the explicit statutory provision which authorizes the SEC to bring such an action. *See SEC v. Texas Gulf Sulphur Co., supra,* 401 F.2d at 855 & n.21.

Legislative discussion of § 21(d) indicates that scienter was not intended to be required in SEC injunction actions.[14] The predecessor of § 21(d)—§ 21(e) of the 1934 Act, 15 U.S.C. § 78u(e) (1970)—provided for an injunction action to be brought by the SEC "[w]henever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule or regulation thereunder . . . ." When § 21(e) was replaced by § 21(d), at the time of the enactment of the Securities Acts Amendments of 1975, 15 U.S.C. § 78u(d) (1976), Congress expressly indicated its approval of the approach taken by our Court with regard to injunction actions brought under § 10(b):

"Private actions frequently will involve more parties and more issues than the Commission's enforcement action, thus greatly increasing the need for extensive pretrial discovery. In particular, issues related to matters of damages, such as scienter, causation and the extent of damages, are elements *not* required to be demonstrated in a Commission injunctive action." (citation omitted) (emphasis in original). S.Rep. No. 75, 94th Cong., 1st Sess. 76 (1975), *reprinted in* [1975] U. S. Code Cong. & Ad. News 179, 254 (discussing new § 21(g) of the 1934 Act, 15 U.S.C. § 78u(g) (1976), added in the 1975 amendments).

It would be difficult to find a clearer indication, at the time of the enactment of § 21(d), that Congress intended to exempt SEC injunction actions from the scienter requirement applicable to private damage actions.

Finally, we are satisfied that rejection of a scienter requirement for SEC injunction actions is consistent with the overall enforcement scheme of the securities acts. The *Hochfelder* holding reflected the Court's concern that the absence of a scienter requirement for private damage actions under § 10(b) would render superfluous the statutory scheme of "express civil remedies" and would "significantly broaden the class of plaintiffs who may seek to impose liability upon accountants and other experts who perform services or express opinions."

---

14. Indeed, an examination of the development of SEC injunction provisions in Congress, beginning with the precursor of both § 17 and § 20 of the final 1933 Act, 15 U.S.C. § 77q and § 77t (1970), demonstrates congressional rejection of a scienter requirement. The Senate draft of the 1933 provision required a showing of scienter for equitable relief:

"It shall be unlawful for any person, firm, corporation, or other entity, *directly or indirectly,* in any interstate sale, promotion, negotiation, advertisement, or distribution of any securities *willfully* to employ any device, scheme, or artifice or to employ any 'dummy', or to act as any such 'dummy', with the intent to defraud or to obtain money or property by means of any false pretense, representation, or promise, or to engage in any transaction, practice or course of business relating to the interstate purchase or sale of any securities which operates or would operate as a fraud upon the purchaser." Section 13, S.875, 73d Cong., 1st Sess., 77 Cong.Rec. 2982 (1933) (emphasis added).

However, the compromise drafted by the Conference Committee and adopted by both the House and the Senate ultimately rejected the Senate proposal and excluded mention of specific fraudulent intent altogether. H.R.Rep.No. 152, 73d Cong., 1st Sess. (1933).

In connection with the creation of the SEC in 1934, the legislative history indicated that Congress was vitally concerned with the need to maintain the flexibility necessary for effective enforcement. *See, e. g.,* S.Rep.No. 792, 73d Cong., 2d Sess. 5 (1934); H.R.Rep.No. 1383, 73d Cong., 2d Sess. 7 (1934). By incorporating in the 1934 Act the same pattern of culpability requirements established by the 1933 Act, namely, by requiring willfulness both in criminal prosecutions under the Act, [see § 32(a) of the 1934 Act, 15 U.S.C. § 78ff(a)] and in suspending or revoking the registration of a broker or dealer, [see § 15(b) of the 1934 Act, 15 U.S.C. § 78o(b)], Congress clearly indicated its rejection of a scienter standard for injunctive relief [formerly § 21(e)] in that that section has no requirement of willfulness. This was made particularly clear by Congress' express rejection of an amendment proposed to limit injunctive relief under the 1933 Act through the establishment of a scienter standard. 78 Cong. Rec. 8703 (1934). *See generally* Note, 77 Colum.L.Rev., *supra* note 11, at 429–35.

425 U.S. at 214 n.33. Such concerns strike us as not applicable to SEC enforcement actions. An examination of the statutory scheme indicates that there are no comparable provisions which would be nullified by permitting SEC enforcement actions to be predicated on a showing of negligence. Indeed, to sanction § 10(b) injunctive relief on proof of negligence would be to harmonize the requirements of that section with the standards governing similar prophylactic provisions of the 1933 Act.[15]

We reject appellant's contention that a permanent injunction was erroneously entered against him under § 10(b) because his actions failed to support a finding of scienter. We hold that, in the context of an enforcement action brought by the SEC to enjoin violations of § 10(b), proof of scienter on the part of the defendant is *not* required.[16]

(B) SECTION 17(a) OF THE 1933 ACT.

Appellant also contends that the holding in *Hochfelder* requires a finding of scienter for SEC injunction actions brought pursuant to § 17(a) of the 1933 Act, 15 U.S.C. § 77q(a). It follows from our holding above under § 10(b) of the 1934 Act that a fortiori scienter is not a requisite element of a government enforcement action to enjoin violations of § 17(a) of the 1933 Act.

While courts in other circuits since *Hochfelder* have divided on whether the holding in *Hochfelder* should apply to actions brought under § 17(a),[17] the rule in this Circuit, as carefully enunciated by Judge Mansfield in *SEC v. Coven, supra*, 581 F.2d at 1026–28, unequivocally is that scienter is *not* required in an SEC injunction action under § 17(a). Focusing on the absence of

any terminology in § 17(a) comparable to the words "manipulative or deceptive" "device" or "contrivance" which the Court found persuasive in *Hochfelder*, our Court in *Coven* held that "we see no reason to give § 17(a) a similarly narrow reading." *Id.* at 1026–27.

We agree and accordingly we reject appellant's claim that the SEC was required to prove scienter with respect to that part of this injunction action brought pursuant to § 17(a).

V.

Finally, we must consider whether, under all of the circumstances of this case, the district court erred in granting a permanent injunction enjoining Aaron from future violations of the securities laws.

 This Court consistently has held— over a period of two decades—that the district court has broad discretion to enjoin possible future violations of the securities laws when past violations have been shown and this determination will not be disturbed on appeal unless it is clearly shown that the district court abused its discretion. *SEC v. Manor Nursing Centers, Inc., supra*, 458 F.2d at 1100; *SEC v. Texas Gulf Sulphur Co., supra*, 446 F.2d at 1306–07; *SEC v. Culpepper*, 270 F.2d 241, 250 (2 Cir. 1959). See *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953). The critical question in determining whether the public interest requires the imposition of a permanent injunction is "whether there is a reasonable likelihood that the wrong will be repeated." *SEC v. Manor Nursing Centers, Inc., supra*, 458 F.2d at 1100. *Accord, SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 807 (2 Cir. 1975).

---

**15.** See note 14, *supra*.

**16.** Having ruled as we have on this question, we agree with the characteristically perceptive observation of our colleague, Judge Friendly, that the question is one "on which the final word will not rest with us." *SEC v. Commonwealth Chemical Securities, Inc., supra*, 574 F.2d at 101.

**17.** *Compare SEC v. American Realty Trust Co.*, 586 F.2d 1001 (4 Cir. 1978); *SEC v. World

Radio Mission*, 544 F.2d 535, 541 n.10 (1 Cir. 1976); *SEC v. Shiell*, [1977–1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,190 (N.D. Fla.1977); *SEC v. Southwest Coal & Energy Co.*, 439 F.Supp. 820, 826 (W.D.La.1977); *SEC v. Geotek*, 426 F.Supp. 715, 726 (N.D.Cal.1976) (scienter not required under § 17(a)) *with Sanders v. John Nuveen & Co.*, 554 F.2d 790 (7 Cir. 1977), *and SEC v. Cenco, Inc.*, 436 F.Supp. 193, 199–200 (N.D.Ill.1977) (scienter required under § 17(a)).

■ It is well established that the commission of past fraudulent conduct gives rise to an inference that continued violations may be expected in the future. *SEC v. Management Dynamics, Inc., supra,* 515 F.2d at 807; *SEC v. Manor Nursing Centers, Inc., supra,* 458 F.2d at 1100. In making its determination, the district court properly considered such factors as the nature of appellant's past violations, *United States v. W. T. Grant Co., supra,* 345 U.S. at 633, and the fact that appellant continues to maintain that his conduct was lawful and innocent. *SEC v. Manor Nursing Centers, Inc., supra,* 458 F.2d at 1101. *Accord, SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90, 100 (2 Cir. 1978); *SEC v. Universal Major Industries,* 546 F.2d 1044, 1048 (2 Cir. 1977). Not only did appellant permit the two salesmen of the firm to engage in fraudulent activities for five months after he had been informed of their false and misleading representations, but he continues to adhere to the position that he had no supervisory responsibilities over them because of his lack of title in the firm. The district court also found that appellant was responsible for arranging the sham transaction for the sale of the Dorfmans' shares in an attempt to circumvent the restrictions of Rule 144.

In addition to the foregoing factors which alone are sufficient to justify a permanent injunction, the district court found that appellant had acted with scienter in committing the violations charged. While we have held that scienter is not a requisite element of a SEC injunction action under § 10(b) or § 17(a), the court's findings that appellant acted with scienter underscore the need for an injunction. *SEC v. Commonwealth Chemical Securities, Inc., supra,* 574 F.2d at 100; *SEC v. Universal Major Industries, supra,* 546 F.2d at 1048.

18. We note .Judge Friendly's cogent observations regarding the evolving judicial attitude toward the issuance of injunctions on the basis of past violations. *SEC v. Commonwealth Chemical Securities, Inc., supra,* 574 F.2d at 99–100. In our view, Judge Friendly's observations would be particularly helpful in reviewing the district court's exercise of discretion in a

Accordingly, we hold that the district court properly exercised its discretion in granting the permanent injunction enjoining appellant from committing further violations of the securities laws.[18]

Affirmed.

close case. But the instant case most assuredly is not a close one. As with the principal defendants in *Commonwealth* with respect to whom Judge Friendly had "no difficulty in sustaining the injunction", *id.* at 100, we hold likewise with respect to Judge Gagliardi's exercise of discretion in enjoining Aaron from future violations of the securities laws.